UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERRI LAWSON-BREWSTER,

       Plaintiff,

                                 Case No. 4:06-cv-58

v

                                 Hon. Wendell A. Miles

RIVER VALLEY SCHOOL DISTRICT,
a Michigan public body, and
JOSE VERA, an individual,

       Defendants.

_____ /

<u>OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff, Cherri Lawson-Brewster, filed this action against her former employer, the River Valley School District ("River Valley"), and her former supervisor, Jose Vera. In her amended complaint, plaintiff alleges that River Valley and Vera violated her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq.*, Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1101 *et seq.*, and Michigan Worker's Disability Compensation Act ("WDCA"), M.C.L. § 418.301. The matter is currently before the court on a motion by the defendants for summary judgment (docket no. 43). Plaintiff has opposed the motion.

For the following reasons, the court grants the motion.

**I**

## **Uncontroverted Facts**

The following uncontroverted facts are taken from the parties' proposed joint Final Pretrial Order.

Plaintiff Cherri Lawson-Brewster began working as a custodian for defendant River Valley in March, 2000.  She worked at the district's River Valley Middle/High School.  Plaintiff was terminated from her employment on December 20, 2004.

Defendant Vera was, at all times relevant to this action, employed by River Valley as the school principal for the River Valley Middle/High School.  He began his employment with the district in July, 2001.  In his position as principal of the Middle/High School, Vera was one of plaintiff's supervisors.  He was involved in the decision to terminate plaintiff.

Plaintiff received workers' compensation for a shoulder injury for a period of approximately one year, from August 26, 2002 until August 17, 2003.  (Due to a recurrence of this same injury, plaintiff took additional workers' compensation leave during the latter part of 2003, as noted below.)  In addition, in March, 2004 plaintiff also applied for FMLA leave. According to plaintiff, her request for leave was necessitated by uterine problems, which required her to have an emergency hysterectomy.  Her request for FMLA leave for this condition was granted.

During the week immediately preceding plaintiff's termination on December 20, 2004, plaintiff was absent from work beginning December 14 and continuing through December 19, 2004.  On December 17, 2004, plaintiff provided the school with a work restriction slip from her doctor's office.  The slip stated that plaintiff had been seen at the clinic on December 16, 2004 and was not able to return to work until Monday, December 20, 2004.  This work restriction slip

2

did not provide a diagnosis or give a reason for plaintiff's visit to the doctor.  On December 20,

2004, plaintiff also provided the school with a handwritten note from a counselor dated

December 17, 2004, stating that plaintiff was in a counseling session.


### Additional Facts

In her First Amended Complaint, plaintiff alleges that in late 2001, Vera asked her to

date him.  (Both parties were unmarried at the time.)  Plaintiff alleges that she turned Vera down.

After that, plaintiff further alleges, Vera treated her differently from other similarly situated

custodians with respect to discipline and reporting of absences from work.  In addition, plaintiff

alleges, in October, 2004, Vera made comments to her containing inappropriate sexual

innuendos and asked her "if she got wild with the eclipse."  First Amended Complaint at 4, ¶ 29.

Plaintiff alleges that on December 16, 2004, "after having been hassled by [Vera] about

doctors notes and other matters," she was not feeling well.  Id., ¶ 30.  She alleges that she called

work to notify them that she would be absent on December 16 and 17, 2004, due to an

unspecified "illness" and medical appointments.  Although plaintiff alleges that her doctor

provided her with paperwork reflecting a diagnosis of depression after seeing her on December

16, id., ¶ 32, plaintiff's pleading itself does not expressly allege that she provided this paperwork

to her employer; instead, she alleges only that she provided the note containing her doctor's

statement that she should remain off work until December 20, 2004.  Id. at 4-5, ¶s 30-31, 33.[1]

---

[1]In paragraph 33 of her First Amended Complaint, plaintiff expressly alleges that she
"delivered *both December 16, 2004 notes* referred to in paragraphs 30 and 31 above to the
defendant on December 17, 2004 before the [scheduled] start of her shift" (emphasis supplied).
However, paragraph 30 does not mention any note, and paragraph 31 refers only to a single
(continued...)

Plaintiff alleges that Vera deemed the information she had provided documenting her absence incomplete, and demanded to meet with her.  Plaintiff alleges that she met with Vera on December 20, 2004, at which time he informed her that she was fired "because the doctor's note did not say that she could return to work 100% and because of an allegedly late but not actually late call in."  Id. at 5, ¶ 35-36.[2]

According to plaintiff's time sheet records, provided by the defendants in support of their motion, plaintiff began missing a substantial amount of work shortly after she started working for River Valley at the end of March, 2000.  Defendants' Exhibit A.  Plaintiff started her employment with the district working third shift, or the night shift, which ran from 10:00 p.m. to 6:30 a.m.  Her hours changed after Memorial Day, 2000.[3]  Plaintiff began calling in sick in July, 2000, missing work on July 5 and 19, 2000.  Plaintiff called in sick four times the following month, missing work on August 8 and 9 and on August 15 and 16, 2000.  Plaintiff called in sick an additional 11 times during her first year of employment, concluding at the end of March, 2001.  During her first year of employment, plaintiff was also disciplined twice for multiple

---

[1](...continued)
doctor's note stating plaintiff should "stay off work until December 20, 2004."  First Amended Complaint at 4-5.

[2]Plaintiff contends that the defendants fired her for not calling in a full two hours before her shift on December 16, 2004.  She contends that this is "factually inaccurate."  Brief in Opposition at 16.  However, it appears that plaintiff herself is confused about the facts.  The defendants have submitted evidence indicating that plaintiff called in less than two hours before her shift on December *6,* 2004, not December *16,* and that this was one of the events that precipitated her termination.  Affidavit of Jose Vera at 4, ¶ 12.  Plaintiff has not disputed that she called in late on December 6, 2004.  The applicable collective bargaining agreement requires two-hour notification of absences, and failure to comply is deemed an offense which may lead to dismissal.  Defendants' Exhibit M.

[3]As the court will discuss in more detail in Part IV.C.2. of this decision below, plaintiff's hours changed a number of times during the course of her employment with River Valley.

instances when she left work early without permission.  Defendants' Exhibits C and D.  In her first performance evaluation, dated June, 2001, plaintiff received a rating of "poor" on attendance.  This was the lowest possible rating.  Defendants' Exhibit E.  (Vera, of course, did not begin working for River Valley until July, 2001.)

Between April and December, 2001, plaintiff called in sick an additional 13 times.  Between January and June, 2002, plaintiff called in sick an additional five times.  Although in a June, 2002 performance appraisal Vera noted that plaintiff's attendance had "improved," Defendants' Exhibit F, plaintiff called in sick an additional six times during July and August, 2002.  As noted above, plaintiff began a workers compensation leave on August 26, 2002, and she did not return to work until August, 2003.

After her workers' compensation leave ended in August, 2003, plaintiff returned to work for just over two months, between August 17, and October 24, 2003.  During this period, she called in sick four times.  Plaintiff then took another month of workers' compensation leave, returning to work for three days at the end of November, 2003.  She took another workers' compensation leave during December, 2003, returning to work on January 20, 2004.  Plaintiff called in sick twice during the first two weeks after her return.

As noted above, in March, 2004 plaintiff applied for and was granted FMLA leave in order to have a hysterectomy.  With the exception of one three-day period, plaintiff was off work from March 15 through May 14, 2004 on approved leave.  However, according to the defendants, plaintiff resumed her pattern of regularly calling in sick not long after returning from her approved FMLA leave.  Plaintiff missed work nine times between June and October, 2004.  The vast majority of these absences were sick days; only one was a "personal" day.  During the

first three weeks of December, 2004 leading up to her termination, plaintiff missed work seven

times; twice during the first week of December and during the entire work week beginning on

December 13, 2004.  Plaintiff was terminated after this last absence.[4]

Plaintiff alleges that she was fired in violation of the FMLA.  Her claim of this and other

"FMLA Violations" (Count I) provides the basis for federal jurisdiction.  Adopting a

quintessential "kitchen sink" approach to pleading and greatly expanding on what could have

been a fairly straightforward federal action, plaintiff has also asserted a series of state law

claims;  the remaining counts of her pleading assert claims of gender and disability

discrimination, sexual harassment, violation of Michigan's workers' compensation law, and

retaliation.  These state law claims include the following: "Retaliatory Termination" against both

defendants, in violation of Michigan's WDCA (Count II); "Sexual Harassment, Retaliatory

Termination and Sex Discrimination" in violation of Michigan's ELCRA (Count III); and a

fourth claim, labeled simply "Persons With Disabilities Civil Rights Act" (Count IV).  Plaintiff

contends variously that she was fired in retaliation for taking FMLA leave, and that her rights

under the FMLA were also violated in other respects; that she was subjected to discrimination

based on her gender, that she was and fired for refusing to date Vera and for complaining about

---

[4]To repeat, all of plaintiff's absences are documented on her time sheets provided as
Defendants' Exhibit A.  However, the defendants have also provided the affidavit of Jose Vera,
as Defendants' Exhibit B, which further discusses plaintiff's attendance.  According to Vera,
both he and Bruce Burnett, the district's Building, Grounds and Maintenance Supervisor,
discussed plaintiff's attendance problems with her between 2002 and December, 2004.  In
addition, several events during the fall of 2004 preceded plaintiff's termination for multiple
absences during December, 2004.  These included plaintiff's failing to have proper doctor's
notes for two absences (apparently, the dates on plaintiff's notes did not coincide with her
absences); plaintiff's coming in late without an excuse; and plaintiff's calling in sick on less than
a two-hour notice, which was required by the applicable union contract.

6

Vera's treatment of her; and that she was wrongfully fired for insufficient documentation of an alleged disability.  Discovery in the action has concluded.


## II

In their motion, the defendants attack each of plaintiff's claims.  They argue that plaintiff was fired for problems related to her attendance, including – but certainly not limited to – excessive absenteeism unrelated to any FMLA or workers' compensation leave.

The applicable collective bargaining agreement lists excessive absenteeism as grounds for immediate discharge.  Defendants' Exhibit M.  The defendants have pointed to evidence that plaintiff had a well-documented poor attendance record throughout her employment and had been reprimanded for issues related to her attendance even before Vera began working for the district.  The defendants further argue that the evidence does not support plaintiff's claims.  More specifically, they argue that there is no evidence from which a reasonable jury could conclude that Vera had a romantic interest in plaintiff, or that her rejection of an alleged offer to go out on a date caused Vera to fire plaintiff more than three years later.  They also argue that plaintiff does not claim that Vera made any sexually explicit comments, touched her, or engaged in any form of overt sexual harassment.  Instead, they argue, plaintiff has described only a few vague comments which she felt were inappropriate.  In addition, they argue that plaintiff's FMLA and PWDCRA claims must fail because she cannot satisfy the threshold requirements for coverage under these statutes.  Finally, they argue that there is no evidence that plaintiff was subjected to gender discrimination or fired because she took FMLA leave, received workers' compensation benefits, or complained about Vera's alleged harassment.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party satisfies that burden in its motion, the party opposing the motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" Id.  The party who bears the burden of proof must present a jury question as to each element of the claim. Davis v. McCourt, 226 F.3d 506, 511 (6th Cir. 2000).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, at 322-323.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." Anderson, 477 U.S. at 248. Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. Elvis Presley Enters, Inc. v. Elvisly Yours, Inc., 936 F.2d 889, 895 (6th Cir. 1991).

In reviewing a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. Where the moving and non-moving parties' versions of events differ in material respects, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. Scott v. Harris, 127 S.Ct. 1769, 1774-1775 (2007) (citations omitted). The weighing of evidence and making of credibility determinations is prohibited on summary judgment. Keweenaw Bay Indian Community v. Rising, 477 F.3d 881, 886 (6th Cir. 2007); see Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Rule 56(e) requires supporting and opposing affidavits to "set forth such facts as would be admissible in evidence." Although this does not mean that a party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment, Celotex, 477 U.S. at 324, evidence submitted in opposition to a motion for summary judgment must be of a type that would be admissible at trial. Alpert v. U.S., 481 F.3d 404, 409 (6th Cir. 2007). As the court will discuss further in Part IV.C.2 of this decision below, the defendants have filed a motion *in limine* challenging the admissibility of certain evidence on which plaintiff relies in her brief opposing

the defendants' motion for summary judgment.  The court previously issued a separate decision granting that motion.

### III

### Federal Claim – FMLA

In her amended complaint, plaintiff alleges that the defendants (1) interfered with her exercise of her rights under the FMLA by not informing her of her obligations and rights under the statute during the "various times" that she went on leaves protected under the FMLA, and (2) discriminated and retaliated against her by terminating her for exercising or attempting to exercise her rights under the statute.

"The FMLA was enacted in 1993 to 'help men and women balance the conflicting demands of work and personal life.'"  Whitaker v. Bosch Braking Systems Div. of Robert Bosch Corp., 180 F.Supp.2d 922, 925 (W.D. Mich. 2001) (quoting Price v. City of Fort Wayne, 117 F.3d 1022, 1024 (7th Cir.1997); 29 U.S.C. § 2601(b)).   The statute grants eligible employees as many as twelve weeks of leave during a one-year period if, among other things, they have a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The FMLA also prohibits an employer from interfering with, restraining, or denying an employee's rights under the statute, 29 U.S.C. § 2615(a)(1), and prohibits an employer from discharging or otherwise discriminating against an employee for opposing any practice made unlawful under the statute.  29 U.S.C. § 2615(a)(2). An employer who fails to provide an employee FMLA leave may be held liable for compensatory damages, liquidated damages, and interest. 29 U.S.C. § 2617.

10

To prevail on a claim for denial of FMLA-protected rights under § 2615, a plaintiff must prove that (1) she is an eligible employee, 29 U.S.C. § 2611(2); (2) the defendant is an employer, 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of her intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which she was entitled. Cavin v. Honda of America Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003).

The parties do not dispute that plaintiff is an eligible employee under the statute, nor do they dispute that the defendants are employers subject to the statute.  See 29 U.S.C. § 2611(2) and (4).   However, regarding plaintiff's claim that she was discharged in violation of the FMLA, the defendants do dispute whether plaintiff can establish that she suffered from a serious health condition as required by the statute.  The defendants argue that there is no competent evidence that plaintiff suffered from a qualifying condition at the time she was terminated.

In this case, plaintiff ostensibly claims that she was entitled to FMLA leave pursuant to 26 U.S.C. § 2612(a)(1)(D), which grants leave based on "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  Regulations promulgated pursuant to the statute define a "serious health condition" entitling an employee to FMLA leave, in respects pertinent to this case, as

> an illness, injury, impairment, or physical or mental condition that involves:
>
> * * *
>
> (2) *Continuing treatment* by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(I) *A period of incapacity* (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) *of more than three consecutive calendar days*, and any subsequent treatment or period of incapacity relating to the same condition, *that also involves*:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. §825.114(a)(2) (emphasis supplied).

"Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging [her] condition to be so." Haefling v. United Parcel Service, Inc., 169 F.3d 494, 499 (7th Cir. 1999). "[I]n the context of the substantive statutory rights contained within the FMLA, an employee must demonstrate by a preponderance of the evidence that [s]he is entitled to the disputed leave." Id. The question is therefore whether plaintiff, who bears this burden, has presented a jury question as to this required element of her FMLA claim.

The court must first consider whether sufficient competent evidence exists demonstrating that plaintiff's depression resulted in "[a] period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment

therefor, or recovery therefrom) of more than three consecutive calendar days[.]"  29 C.F.R. §

825.114(a)(2)(I).  "Without such a showing, the plaintiff cannot rely on this definition of a

"serious health condition" to defeat a motion for summary judgment."  Haefling, 169 F.3d at

499.

Plaintiff argues that the facts show that she "called off from work" on for the dates of

December, 14, 15, 16, and 17  "because of symptoms of depression regarding the pressure she

was experiencing from work."  Brief in Opposition at 12.[5]  Plaintiff further argues that she saw

her family physician, Dr. Osburn, on December 16, 2004.  According to plaintiff, Dr. Osburn did

the following: (1) diagnosed depression, (2) wrote a note keeping plaintiff "off work" until

December 20, 2004, (3) prescribed the drug Lexapro, and (4) referred plaintiff to a counselor,

Richard Watson, whom she saw on December 17, 2004.  Id.  However, as the defendants have

noted, the evidence also shows that plaintiff also called in sick on December 13, 2004.

Defendants' Exhibit A (final page, showing plaintiff's timecard for the week of December 12 -

18, 2004).  Plaintiff, who had already missed work for a full three days (December 13, 14, and

15) by the time she saw Dr. Osburn on December 16, 2004, has admitted that she was not

restricted from working before December 16, 2004, and that December 18 and 19, 2004 were

weekend days.  Therefore, the defendants argue, Dr. Osburn's slip restricted plaintiff from

working at most only two consecutive days, December 16 and 17, 2004.  In addition, defendants

further argue, the counselor plaintiff saw merely concurred with Dr. Osburn's assessment that

---

[5]Plaintiff argues that she provided Vera's administrative assistant, Tammie Schmidt, with the
reason for her absences between December 14 and 17, 2004.  Brief in Opposition at 5-6.
However, the extent that plaintiff is intimating that she told Schmidt about the diagnosis of
depression, plaintiff's citations to the record accompanying her argument do not substantiate this
particular position.

plaintiff remain off work until December 20, 2004.  Plaintiff has admitted that although she saw

Watson during this period, he did not extend her time off work.  Defendants' Exhibit N at 107-

108.[6]    According to the defendants, this means that there is no evidence showing that a doctor

or other health care provider determined that plaintiff was "incapacitated" for "more than three

consecutive calendar days" as required by the regulations.

Plaintiff argues that she was in fact incapacitated from working for six days, from

December 14 through 19, 2004.  However, as the defendants have noted, plaintiff does not offer

any competent evidence that her "period of incapacity" included December 13, 14 and 15.  This

leaves the four-day period from December 16 through December 19, 2004, two of which were

weekend days on which plaintiff was not scheduled to work anyway.  Dr. Osburn's bare bones

affidavit states merely that he "did not think [plaintiff] should work for health reasons[.]"

Nothing in the doctor's affidavit indicates that plaintiff was restricted from any activities other

than work on December 18 and 19, 2004.

When an illness or injury spans a period of time during which an employee is not

scheduled to work, the regulations contemplate that an employee may submit evidence that

demonstrates an inability to "perform other regular daily activities."  Haefling, 169 F.3d at 500.

Such a showing is not a difficult one, and a complete lack of evidence in the record on this issue

makes it impossible for a plaintiff to demonstrate entitlement to leave under the broad definition

of a "serious health condition."  Id.  Although it may be a reasonable inference that an employee

unable to perform routine daily activities would probably be unable to attend work, the inverse is

_____

[6]Watson's affidavit, which plaintiff has provided as an exhibit to her response brief, indicates
that Watson concurred with Dr. Osburn that plaintiff remain off work until December 20, 2004.

14

not necessarily true.  In addition, although all reasonable inferences must be drawn in favor of the party opposing summary judgment, the court is under no obligation to draw these inferences from assumptions that are unsupported by the record.  Id.  Plaintiff is required to show both a period of incapacity exceeding three consecutive days *and* treatment by a health care provider. She has shown the latter, but not the former.  Accordingly, plaintiff's failure to come forward with any evidence that her depression precluded her from working or performing any other daily activities on December 18 and 19, 2004 necessarily results in a conclusion that the defendants are entitled to summary judgment on plaintiff's claim under the FMLA.

Because the evidence in the record is insufficient to establish a genuine issue of material fact regarding whether plaintiff suffered from a "serious health condition" as defined by the applicable law, the defendants are entitled to judgment as a matter of law on plaintiff's claim that she was deprived of FMLA leave for her depression.  The court therefore need not consider whether plaintiff can establish the remaining two elements of her claim.  However, even if plaintiff had established raised a genuine issue regarding whether she suffered from a "serious health condition" as required by the FMLA, the defendants have further argued that plaintiff cannot satisfy the fourth required element of her claim:  the requirement that she give her employer notice of her intention to take leave.  The defendants argue that the evidence shows that plaintiff did not in fact provide the notice required by the statute.

"[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting leave."  Brohm v. JH Properties, Inc., 149 F.3d 517, 523 (6th Cir. 1998).  "While the employee need not actually mention the FMLA by name, '[t]he critical question is whether the information imported to the employer is sufficient to reasonably apprise

it of the employee's request to take time off for a serious health condition.'" Id. (citation

omitted).   The notice, therefore, must do more than indicate that the employee is simply taking a

sick day.  See Walton v. Ford Motor Co., 424 F.3d 481, 487 (6th Cir. 2005) (telling employer to

list him as taking a "sick day" was not sufficient to impart notice that plaintiff required FMLA

leave); see also Collins v. NTN-Bower Corp., 272 F.3d 1006, 1008 (7th Cir. 2001) (calling in

"sick" does not imply a serious health condition).

An employee has an affirmative duty to indicate both the need and the reason for the

leave.  Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990-991 (8th Cir. 2005); Sanders v. May

Dept. Stores Co., 315 F.3d 940, 944 (8th Cir.2003).  The employee must also let the employer

know when they anticipate returning to their position.  Woods, 409 F.3d at 990-991; 29 C.F.R. §

825.302(c).[7]  The employer is expected to seek through informal means any additional

information that may be required regarding the employee's need for leave, 25 C.F.R. §

825.303(b), including information necessary to determine if the leave is because of a serious

health condition.   25 C.F.R. § 825.302(c).  This is apart from requesting written certification

from a health care provider.  See 29 C.F.R. § 825.305.   Finally, the employee's notice must also

_____

[7]Title 29 C.F.R. § 825.302(c) provides as follows:

> (c) An employee shall provide at least verbal notice sufficient to make the
> employer aware that the employee needs FMLA-qualifying leave, and the
> anticipated timing and duration of the leave. The employee need not expressly
> assert rights under the FMLA or even mention the FMLA, but may only state that
> leave is needed for an expected birth or adoption, for example. The employer
> should inquire further of the employee if it is necessary to have more information
> about whether FMLA leave is being sought by the employee, and obtain the
> necessary details of the leave to be taken. In the case of medical conditions, the
> employer may find it necessary to inquire further to determine if the leave is
> because of a serious health condition and may request medical certification to
> support the need for such leave (see § 825.305).

be timely in order for his leave to be covered by the FMLA.  <u>Woods</u>, 409 F.3d at 991.  "The statute demands 'such notice as is practicable' unless the need for medical leave is foreseeable, when thirty days advance notice must be given."  <u>Id</u>. (citing 29 U.S.C. § 2612(e)(2)(B) and 29 C.F.R.§ 825.303(a)).

Here, the allegations of plaintiff's own complaint state that she simply dropped a doctor's note off at work on December 17, 2004.  First Amended Complaint at 4-5, ¶ 33.  Although plaintiff argues that a simple doctor's note is sufficient notice under the circumstances, her case law citations do not support this position.  In <u>Price v. City of Fort Wayne</u>, 117 F.3d 1022 (7th Cir. 1997), the plaintiff both completed an employer-provided leave request form and indicated that the cause was medical need.  She also attached a doctor's note requiring her to take the time off. Both together were deemed to be sufficient information to put the City on notice that this was a possible FMLA leave situation.  <u>Id</u>. at 1025 -1026.  In addition, <u>Wilson v. Lemington Home for the Aged</u>, 159 F. Supp. 2d 186 (W.D. Pa. 2001), also cited by plaintiff, does not support her argument at all.  The same holds true for <u>Conrad v. Eaton Corp.</u>, 303 F.Supp. 2d 987 (N.D. Iowa 2004).  In that case, it was the employer who sent the plaintiff home from work, after he had behaved in a volatile and threatening manner.  <u>Id</u>. at 992.  On the same day that the plaintiff was sent home, he provided his employer with a note from his psychiatrist stating, "No work until further notice!"  This, in combination with the employer's knowledge of the plaintiff's behavioral volatility, was found to have adequately apprised the employer of the plaintiff's illness.  <u>Id</u>. at 998.  No similar situation is presented here.

The Sixth Circuit case of <u>Perry v. Jaguar of Troy</u>, 353 F.3d 510 (6th Cir. 2003), also cited by plaintiff, does not provide any support whatsoever for plaintiff's position about a doctor's

note .  The plaintiff in Perry specifically requested leave to care for his impaired son, and the

employer was aware of the son's condition.  However, although the court apparently deemed the

notice sufficient, a ruling granting summary judgment in favor of the employer was affirmed

because the evidence was deemed insufficient to enable a jury to reasonably conclude that

plaintiff's son was incapacitated during plaintiff's leave and, thus, had a serious health condition

qualifying for an FMLA leave.  Id. at 516.

In this case, the note which plaintiff provided from her doctor was on the doctor's

office's own pre-printed form, containing the doctor's name but not his signature.  Plaintiff's

Exhibit 40.  Two boxes on the note were checked indicating (1) that plaintiff was seen in the

clinic on that day (December 16, 2004), and (2) plaintiff was not able to return to work until

Monday, December 20, 2004.[8]  When plaintiff showed up at work to drop off the note, she

alleges, Vera "requested an immediate meeting because the medical notes were ostensibly

incomplete[.]" First Amended Complaint at 5, ¶ 34.[9]   This was a verbal request for additional

---

[8]Actually, as noted in Part I of this decision above, plaintiff's complaint refers to doctor's
note*s* – in the plural – although there is no allegation that her doctor authored more than one
note.  However, according to the defendants, plaintiff might have been referring to a billing
invoice she received from her doctor containing a notation that plaintiff's diagnoses were
headaches and depression.  Brief in Support of Defendants' Motion for Summary Judgment at
26.  Plaintiff's exhibits include what appears to be a medical clinic invoice.  Plaintiff's Exhibit
39.  Although portions of the document are illegible, it contains the diagnoses "HA" –
presumably headache – and depression.

[9]Plaintiff has provided her own affidavit – in which she appears to contradict the express
allegations of her complaint – in which she states that no one from River Valley asked her to
"provide a certification of [her] medical condition related to [her] absence from work from
December 14, 2004 through December 20, 2004."  Affidavit of Cherri Lawson-Brewster at 2-3, ¶
10.  To the extent that this indicates that River Valley did not demand a written FMLA
certification, this statement might be true.  However, to the extent that plaintiff intends to infer
that River Valley did not make an informal, verbal request for additional information regarding

(continued...)

information, which an employer is entitled to make.  However, plaintiff does not allege that she

provided the requested information at that time; instead, she alleges, she "pointed out that she

was not supposed to be working" and requested to "reschedule" Vera's request for a meeting.

Id., ¶ 35.  Therefore, plaintiff agreed to meet with Vera on December 20, 2004, knowing full

well that he was asking for additional information regarding her absence from work.[10]

However, plaintiff does not allege in her pleading that she provided this additional

information, nor has she pointed to evidence that she provided River Valley with this

information.  Instead, it appears that plaintiff merely delivered a note from her counselor which

stated that she had a session with him on December 17, 2004.[11]  This note, even when combined

with the information from Dr. Osburn's office, did not serve to provide River Valley with the

notice required under the FMLA.[12]  Because plaintiff admits that she did not even meet with the

_____

[9](...continued)
her absence, plaintiff's statement is inconsistent with her pleadings and is therefore insufficient
to raise a genuine issue of fact.  "Plaintiffs are bound by admissions in their pleadings, and a
party cannot create a factual issue by subsequently filing a conflicting affidavit."  Hughes v.
Vanderbilt University, 215 F.3d 543, 549 (6th Cir. 2000).

[10]Plaintiff has admitted that Vera followed up his request for additional information in
writing.  Brief in Opposition at 7.  Plaintiff's Exhibit 43 is a copy of a December 17, 2004 letter
which Vera sent to plaintiff, in which he confirmed their conversation regarding the
insufficiency of the doctor's note.

[11]In her response brief, plaintiff states that at the December 20, 2004 meeting, she provided "a
document from her counselor indicating that she was seeing him."  Brief in Opposition at 7.
However, none of the record cites plaintiff has provided at the conclusion of a paragraph
containing this statement indicates the contents of this document.  Instead, it appears that
plaintiff might be referring to her Exhibit 42, which is a note from Richard Watson.  The note,
dated December 17, 2004, reads in its entirety as follows: "Ms. Brewster was in session with me
from 4:00 p.m. to 5:35 p.m. December 17."  The note is stamped "Received" by "River Valley
M/HS" on December 20, 2004.

[12]If plaintiff's "serious medical condition" first presented itself on December 13, 2004 instead
(continued...)

19

counselor until December 17, 2004, and because she does not remember whether he spoke with her about taking additional time off work, Pl. Dep. at 62-63, 65, 68, and she further admits that her counselor did not tell her to take time off work, Pl. Dep. at 108, plaintiff cannot establish that she provided notice that she needed to take FMLA leave for her depression.

Plaintiff argues that the FMLA and its accompanying regulations do not permit an employer to terminate an employee merely for failing to provide proper notice.   In support of this argument, she cites to a string of cases for which she provides neither internal page numbers nor a discussion of the case holdings.  Brief in Opposition at 15.  The court has reviewed these cited cases and remains unimpressed that they support plaintiff's claim in this action.  In Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549 (6th Cir. 2006), the plaintiff was attempting to extend

---

[12](...continued)
of December 16, 2004, then plaintiff unquestionably did not give timely, adequate notice.  The regulations provide that even where the need for leave is unforeseeable, it is expected that an employee "will give notice to the employer "within no more than one or two workings days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible." 29 C.F.R. § 825.303(a).  Assuming that plaintiff's depression did not come on overnight (and – because she attributes her depression to her ongoing situation at work – it more likely than not did not surface overnight), she could reasonably predict that her condition could lead her to miss work on occasion for treatment, and she could have given the notice contemplated by the regulations.  Collins v. NTN-Bower Corp., 272 F.3d 1006, 1008 (7th Cir. 2001).

It is insufficient for the employee to simply tell the employer that he or she is not feeling well.  See Brennman v. MedCentral Health System, 366 F.3d 412, 423 (6th Cir. 2004) (employee's call saying he "wasn't doing well" and "wouldn't be in today" without mention of diabetes as reason for absence did not provide timely notice that leave was FMLA-qualifying). Where an employee with a spotty attendance record merely calls in "sick," this is insufficient to trigger the FMLA's protections.  Collins, 272 F.3d at 1008-1009.  Moreover, plaintiff would have needed to notify her employer of more than the mere fact that she had been diagnosed with something called "depression" in order put them on notice that she had a serious health condition.  Rask v. Fresenius Medical Care North America, 509 F.3d 466, 472 -473 (8th Cir. 2007).  Timely notice is essential, even where the employee suffers from clinical depression. Collins, 272 F.3d at 1008.

her FMLA leave, and the issue was whether she provided sufficient notice to do so.  The court

found that she did.  The court also stated that "even if [plaintiff's] notice had been late, [the

employer's] only legal recourse would have been either to waive the notice requirement or to

delay her leave.  The statute and regulations do not permit an employer to terminate an employee

merely for failure to provide timely notice."  Killian, 454 F.3d at 554.  To the extent that plaintiff

relies on this last statement to support an argument that she could not be terminated for failing to

provide timely notice of when she intended to return to work, her reliance is misplaced.  Plaintiff

was not terminated for failing to provide timely FMLA notice; she was terminated for reasons

related to her attendance.  The defendants' assertion of insufficient notice – of either foreseeable

or unforeseeable leave – is merely part and parcel of their argument that plaintiff cannot

establish a required element of her claim.  (This is separate and apart from any affirmative

defense that the employee's certification was insufficient.)

Plaintiff also cites to Byrne v. Avon Products, Inc., 328 F.3d 379 (7th Cir. 2003).  That

case is not like this one, however.  The plaintiff in that case was fired for both sleeping on the

job and for failing to attend a scheduled meeting with the employer to discuss his behavior.  Id.

at 380.  The employer had been told by a family member that the plaintiff was "very sick," and

the employer learned on the following day that the employee had been hospitalized.  Therefore,

the plaintiff was deemed to have a qualifying condition.[13]

_____

[13]Like the plaintiff in this case, the plaintiff in Byrne suffered from depression.  However, the
plaintiff's depression in that case was severe enough to require hospitalization, which made it a
qualifying condition under 29 C.F.R. § 825.114(a)(1).  (The plaintiff in this case is, in contrast,
claiming a qualifying condition under 29 C.F.R. § 825.114(a)(2), not (a)(1).)  In addition, the
court in Byrne suggested that because the plaintiff had behaved unusually at work before his
hospitalization, this could constitute notice to the employer that FMLA leave might be

(continued...)

The additional three cases plaintiff includes in her string cite offer no better support for her position.  In Haschmann v. Time Warner Entertainment Co., 151 F.3d 591, 605 (7th Cir. 1998) the employee was fired even though she had provided a doctor's note that she needed to take leave, in addition to notice from her attorney that she was claiming her right to medical leave under the FMLA.  That is not the situation presented here.  In McClain v. Southwest Steel Co., Inc., 940 F. Supp. 295, 300 (N.D. Okla. 1996), the plaintiff was found to have created a genuine issue as to whether he was entitled to leave under the FMLA at the time of his termination.  In addition, also unlike this case, the employer apparently did not inquire further to ascertain additional facts regarding the employee's need for leave.  Id. at 300.  And in Williams v. Shenango, Inc., 986 F. Supp. 309, 320 (W.D. Pa.1997), the employer likewise did not inquire further of the employee when he requested leave.  In addition, the employee's need for leave was attributable to his wife's health condition, which unquestionably qualified for leave; evidence showed that the wife required a six-day hospitalization followed by a six-week recuperation and assistance with daily living activities.  Id. at 320.  The court is not persuaded that any of these cited cases afford plaintiff with a means of creating a genuine issue of fact sufficient to avoid

---

[13](...continued)
necessary.  Byrne, 328 F.3d at 381-382.  However, as another court has observed, this holding appears to allow notice of a kind outside of the scope contemplated in the governing regulations. Conrad v. Eaton Corp., 303 F. Supp.2d 987, 998 (N.D. Iowa 2004) (citing 29 C.F.R. § 825.303(b) (stating that notice of need for FMLA leave can be provided "in person, by telephone, . . . or other electronic means") and Beal v. Rubbermaid Commercial Prods., Inc., 972 F. Supp. 1216, 1227 (S.D. Iowa 1997) (if the need for leave is not foreseeable, "an employee must give at least verbal notification to the employer within one or two business days from when the need for leave becomes known to the employee") (quoting 29 C.F.R. § 825.303), aff'd, No. 97-3656, 1998 WL 231267 (8th Cir. May 7, 1998)).  In Byrne, the employee's sister had called the employer, who later learned of the hospitalization.  Moreover, in the case at bar, it is noted, plaintiff appears to have been quite capable of providing foreseeable notice of her alleged need for leave; she was able to use the telephone, and to travel to the school to drop off keys.

summary judgment in this action.

Plaintiff also alleges that the defendants unlawfully retaliated against her for taking FMLA leave for her hysterectomy during the spring of 2004.  However, plaintiff cites to no evidence supporting such a claim.   In the absence of either direct or indirect evidence of retaliation, such a claim fails.  Plaintiff cannot even show temporal proximity between the time she took leave and the time of her termination.  See Skrjanc v. Great Lakes Power Service Co. 272 F.3d 309, 315 (6th Cir. 2001) (one month period between the date employee informed employer of intention to take a leave and discharge was insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was pretextual).  In addition, plaintiff's accumulation of additional, unrelated absences after her spring, 2004 FMLA leave makes it virtually impossible to draw an inference that her protected leave played any part in her termination several months later.  Therefore, plaintiff cannot meet her burden of raising a genuine issue of material fact as to whether the defendants' reason for firing her was a pretext for unlawful retaliation under the FMLA.

Finally, plaintiff argues that in their motion, the defendants have addressed her FMLA retaliation claim but not her "interference" claim under this statute.  Plaintiff argues that she has actually has two such claims: (1) one based on the defendants' alleged conduct related to plaintiff's leave in March and April, 2004 in order to have a hysterectomy, and (2) one based on the defendants' alleged failure to give her written notice of her rights under the FMLA in connection with her alleged request for leave for treatment of her depression in December, 2004.

It is perhaps wishful thinking on plaintiff's part for her to interpret the defendants' motion as not fully addressing her FMLA claims.  In connection with plaintiff's absences

immediately preceding her December, 2004 termination, the defendants have clearly argued that plaintiff cannot establish a serious health condition to which the FMLA applies.  As the court has concluded above, plaintiff has not pointed to evidence which creates a genuine issue of fact regarding whether her depression qualified as a "serious health condition."  Therefore, to the extent that plaintiff has attempted to assert an "interference" claim based on being prevented from taking leave for treatment of her depression in December, 2004, such a claim fails as a matter of law.

As for plaintiff's claim that the defendants' "interfered" with her FMLA rights with respect to her March - April, 2004 leave, as the defendants have noted, plaintiff applied for and was granted FMLA leave which began on March 10, 2004.  She returned to work in the middle of May, 2004.  Affidavit of Jose Vera at 3, ¶ 9.

The defendants have submitted evidence that written notifications of employees' FMLA rights were posted in several locations throughout the school where plaintiff worked.  Id. at 5, ¶16.  (According to federal regulations, an employer may delay the onset of FMLA leave due to lack of sufficient notice by the employee, where the employer has properly posted the required notice of FMLA rights at its workplace.  29 C.F.R. § 825.304(c).)  In addition, an employee handbook which plaintiff was provided included a section discussing rights under the FMLA. Id.  After plaintiff's leave began in March, 2004, she was also provided with a complete packet containing the school district's application for FMLA leave.  Defendants' Ex. W.  Although plaintiff was requested to provide documentation regarding her need for leave, she has not alleged that she was denied leave, and her own amended complaint alleges that she was off work for several weeks under a leave protected by the FMLA.  First Amended Complaint at 4, ¶ 27.

Plaintiff nonetheless apparently assesses that she has a valid "interference" claim under the FMLA in connection with the taking of this leave because the defendants gave her a hard time and weren't happy about it.

According to plaintiff's pleadings, she developed uterine problems in March, 2004, and when she reported the need for time off work, Vera "demanded to know exactly what the problem was[.]"  First Amended Complaint at 3, ¶23-25.  Plaintiff alleges that she "became so upset she began to cry" when she was forced to tell Vera "personal details in order to save her job[.]"  Id., ¶ 25.  However, as noted above, the employer is entitled and even required by the FMLA to informally seek additional information that may be required regarding the employee's need for leave, including information necessary to determine if the leave is because of a serious health condition.   25 C.F.R. § 825.302(c); 25 C.F.R. § 825.303(b).   Although plaintiff apparently believes that she should be able to simply tell her employer she cannot work, that is not what the law provides.  Her employer lawfully asked for additional information, and plaintiff was given medical leave.  The FMLA is not violated merely because plaintiff felt embarrassed about having to discuss why she needed time off work.

In their reply brief, the defendants argue that plaintiff's attempt to assert a claim arising out of alleged difficulty and frustration she experienced in obtaining the FMLA leave which she requested and received in March and April, 2004 is frivolous.  The defendants are correct. Where an employee asserts an "interference" theory, as opposed to a retaliation theory, "'[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA – for example, a twelve-week leave or reinstatement after taking a medical leave.'" Arban v. West Publishing Corp., 345 F.3d 390, 401 (6th Cir. 2003) (citation omitted).  To prevail

on an interference claim, a plaintiff must establish that (1) she is an "[e]ligible employee," 29

U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee

was entitled to leave under the Act, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer

notice of her intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the

employee benefits to which she was entitled.  Saroli v. Automation & Modular Components,

Inc., 405 F.3d 446, 454 (6th Cir. 2005).  Plaintiff has neither alleged nor shown that she was

denied benefits to which she was entitled when she took leave in March and April, 2004.

"Even when an employee proves that his employer violated [section] 2615, '[section]

2617 provides no relief unless the employee has been prejudiced by the violation.'"  Cavin, 346

F.3d at 726 (citation omitted).  "[T]he FMLA does not permit recovery for emotional distress."

Brumbalough v. Camelot Care Centers, Inc., 427 F.3d 996, 1007 (6th Cir. 2005 ).  Summary

judgment in favor of a defendant may properly be granted on a claim under the FMLA where the

employee has pointed to no economic benefits that she has lost from the denial of FMLA leave.

Williams v. Toyota Motor Mfg., Kentucky, Inc., 224 F.3d 840, 844-845 (6th Cir. 2000), reversed

on other grounds, 534 U.S. 184 (2002).  Here, plaintiff has not identified any economic benefits

she lost as a result of the defendants' alleged actions in granting her hysterectomy leave; she

merely alleges that she incurred "unnecessary hassle and stress."  Brief in Opposition at 4.

Therefore, this "interference" claim, like plaintiff's interference claim based on her final

absences from work in December, 2004, also fails as a matter of law – though for a different

reason.  Under the circumstances, the defendants are entitled to summary judgment in their favor

on plaintiff's dual "interference" claims under the FMLA.

## IV

## State Law Claims

The remaining counts of plaintiff's complaint consist of multiple claims based solely on state law.  "In any action in which the district court has original jurisdiction, it also has 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]'"  Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 209 (6th Cir. 2004) (quoting 28 U.S.C. § 1367(a)). "Claims form part of the same case or controversy when they 'derive from a common nucleus of operative facts.'"  Harper, 392 F.3d at 209 (quoting Ahearn v. Charter Twp. of Bloomfield, 100 F.3d 451, 454-455 (6th Cir. 1996)).  Here, there is little doubt that plaintiff's federal and state-law based claims derive from a common nucleus of operative facts, insofar as all of these claims arise from plaintiff's employment and/or its termination.  The court therefore concludes that it has supplemental jurisdiction over plaintiff's state law claims.

However, although the court has supplemental jurisdiction over plaintiff's state law claims, the court is not required to exercise that jurisdiction.  See City of Chicago v. International College of Surgeons, 522 U.S. 156, 172 (1997) ("Of course, to say that the terms of § 1367(a) authorize the district courts to exercise supplemental jurisdiction over state law claims . . . does not mean that the jurisdiction *must* be exercised in all cases") (emphasis in original). The applicable statute expressly authorizes a district court to "decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3).  The statute's wording is permissive ("The district court **may** decline ..."; emphasis supplied), thus providing the court with discretion in determining whether or not to

continue to exercise supplemental jurisdiction once all federal claims have been dismissed.  See Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 853 (6th Cir. 2007) ("Under 28 U.S.C. § 1367(c)(3), it was within the district court's discretion to decline to exercise jurisdiction over Plaintiffs' state-law claims once it dismissed the federal claims") (footnote omitted); Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254 (6th Cir.1996) ("A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims").

The supplemental jurisdiction statute codifies the principles developed as part of the doctrine of pendent jurisdiction.  City of Chicago, 522 U.S. at 173, 118 S.Ct. at 533.  These principles require district courts to deal with cases involving supplemental claims "in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine."  Id. (internal quotation marks and citation omitted).  The supplemental jurisdiction statute "thereby reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" Id., 522 U.S. at 173, 522 U.S. at 534 (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)).

The Supreme Court has recognized that "in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims."  Robert N. Clemens Trust, 485 F.3d at 853 (quoting Carnegie-Mellon, 484 U.S. at 350 n. 7).  Therefore, "the usual course is for the district court to dismiss state-law claims without prejudice if all federal claims are disposed of on

28

summary judgment."   Brandenburg v. Housing Authority of Irvine, 253 F.3d 891, 900 (6th

Cir.2001).  However, this  statement "does not establish a mandatory rule to be applied inflexibly

in all cases."  Carnegie-Mellon, 484 U.S. at 350 n.7, 108 S.Ct. at 619 n.7.  Instead, "[t]he

statement simply recognizes that in the usual cases in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine –

judicial economy, convenience, fairness, and comity – will point toward declining to exercise

jurisdiction over the remaining state-law claims."  Id.  Because supplemental jurisdiction is a

doctrine of discretion, dismissal is not mandatory even if the federal claim which forms the basis

for original jurisdiction is eliminated.  Harper, 392 F.3d at 210.

Here, no party has ever suggested that the court that it should relinquish supplemental

jurisdiction under the other subsections of § 1367(c), which permit dismissal of state law claims

even before all federal claims have been dismissed.  See 28 U.S.C. §§ 1367 (c)(1), (2), and (4)

(which provide, respectively that supplemental jurisdiction may be declined if  "the claim raises

a novel or complex issue of State law," if "the claim substantially predominates over the claim or

claims over which the district court has original jurisdiction," or if "in exceptional

circumstances, there are other compelling reasons for declining jurisdiction").  Plaintiff filed this

action in federal court, and the defendants have never contended that any of her state-law based

claims should not proceed here.  Although plaintiff's state law claims overwhelmingly

predominate in terms of both scope and proofs, and the court would likely have been inclined to

decline jurisdiction over these claims had it undertaken a review of jurisdictional issues earlier in

the case, the fact remains that the court did not undertake such an early review.  As matters now

stand, the case has been on the court's docket for nearly two years, and the proceedings have

advanced beyond the point of discovery completion to the filing of a summary judgment motion

and even beyond, to the preparation of a proposed final pretrial order.   Because the case has

proceeded this far, and because a non-merits dismissal of plaintiff's state law claims at this point

and under the circumstances presented could result in a waste of judicial resources and result in

additional delay, the court concludes that the values of  economy, convenience, fairness, and

comity counsel in favor of the court proceeding on the merits of these claims.  See Taylor v. First

of Amer. Bank - Wayne, 973 F.2d 1284, 1288 (6th Cir. 1992) (district court did not abuse its

discretion in denying motion to remand even though amended pleading abandoned federal claim,

where case had been on docket for almost two years, parties had completed discovery and

compiled a voluminous record, and an extensively briefed summary judgment motion was ripe

for ruling).


### A

### WDCA

In her amended complaint, plaintiff alleges that she received less favorable treatment

during her employment and was ultimately terminated because she received workers'

compensation benefits in connection with her shoulder injuries.  The WDCA provides that an

employee who receives a personal injury arising out of and in the course of employment with a

covered employer shall be paid specified wage loss benefits and medical services and is entitled

to medical rehabilitation services.  M.C.L. §§ 418.301(1), 418.315(1), 418.319.  The statute also

makes it unlawful for an employer to "discharge an employee or in any manner discriminate

against an employee" because the employee filed a complaint or instituted a proceeding under

the statute or because of the employee's exercise of a right afforded by the Act.  Id. §
418.301(11).

Although the statute fails to specify a remedy for retaliation or even a means to enforce
the right to be protected from retaliation, Michigan courts have recognized a common law
exception to Michigan's employment at will doctrine for discharges that violate public policy.
Harper v. AutoAlliance Intern., Inc., 392 F.3d 195, 203 (6th Cir. 2004).  "Even before the
Michigan legislature incorporated an explicit prohibition against retaliation into the [WDCA],
the Michigan Court of Appeals held that a discharge for exercising rights under the Act gives
rise to a cause of action for wrongful discharge in violation of public policy."  Id.   Recovery in
such an action may include compensation for lost wages, back and front pay, and damages for
mental or emotional distress.  Phillips v. Butterball Farms Co., Inc., 531 N.W.2d 144, 145 (Mich.
1995).

In an action for retaliatory discharge for exercising rights under the WDCA, "[t]he
burden is on plaintiff to show that there was a causal connection between the protected activity,
i.e., the filing of [her] worker's compensation claim, and the adverse employment action."  Chiles
v. Machine Shop, Inc., 606 N.W.2d 398, 404 (Mich. Ct. App. 1999).  In this case, it is
undisputed that plaintiff applied for and received worker's compensation benefits, and that she
was eventually fired.  The same "shifting burdens of proof" apply to this claim as apply to other
statutory retaliation claims, in the absence of direct evidence of a retaliatory purpose.  See id.
(plaintiff had the burden of proving that (1) he asserted his right for worker's compensation, (2)
defendant laid off or failed to recall plaintiff, (3) defendant's stated reason for its actions was a
pretext, and (4) defendant's true reasons for its actions were in retaliation for plaintiff's having

filed a worker's compensation claim).   The defendants argue that plaintiff cannot prevail on her retaliation claims because there is no evidence showing a causal relationship between her receipt of workers' compensation benefits and her termination.

In this case, the defendants have submitted evidence that plaintiff was fired in December, 2004 for issues related to her attendance quite apart from any workers' compensation leave which plaintiff took during 2002 and 2003.   In order to show that the defendants' proffered legitimate, non-discriminatory reason is pretextual, plaintiff must show "'either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge.'"  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting McNabola v. Chicago Transit Authority, 10 F.3d 501, 513 (7th Cir.1993)) (emphasis in original).   Here, it is clear that plaintiff cannot prove pretext either by showing that the proffered reasons had no basis in fact or that they were insufficient to motivate her firing.  Plaintiff does not dispute evidence submitted by the defendants that during her last seven months of employment, between June and December 20, 2004, she called in sick numerous times.  Therefore, she must instead show that the proffered reasons did not actually motivate her discharge.  In other words, she must show "circumstances which tend to prove that an illegal motivation was more likely" than the reasons offered by the defendants."  Id.

Plaintiff argues that she is able to show pretext in a number of ways.  First, she argues that there is evidence that Vera harbored "ill will and spite" toward her, because he made "numerous sarcastic and disparaging statements" to her.  Brief in Opposition at 31.  In support of this argument, plaintiff states that Vera accused her of malingering; that Vera told her he did not

32

believe that she had injured her shoulder at work; and that Vera accused her of sleeping on the job. Plaintiff has not indicated when these statements were made, and therefore she has not established a circumstantial temporal connection between Vera's statements and her termination.[14]

The evidence shows that plaintiff took workers' compensation leave between August, 2002 and August, 2003. Plaintiff was again off work receiving workers' compensation pay between October and December, 2003, after she allegedly suffered an aggravation of her injury. She returned to work in January, 2004. She was not fired until almost a year later, in December, 2004, after she had missed numerous additional days of work for reasons which the record does not suggest had anything whatever to do with her workers' compensation leave.

Second, plaintiff also argues that "there were several custodians during Mr. Vera's tenure who had a history of having filed worker's compensation claims" and that "Mr. Vera terminated all of them." Brief in Opposition at 31. However, the citations to the record which accompany plaintiff's argument in no way support her assertions. Plaintiff has pointed to no evidence in the record which supports her argument that Vera fired all the custodians who took workers' compensation leaves. Although this evidence shows that some custodians were fired, there is no evidence that they had taken workers' compensation leaves.[15] The only evidence to which

_____

[14]Even assuming that Vera did make disparaging statements to plaintiff about her receiving workers' compensation benefits, these statements did not in themselves constitute an adverse employment action. See Pena v. Ingham County Rd. Comm'n, 660 N.W.2d 351, 359 (Mich. Ct. App. 2003) (in action filed under ELCRA, employer's investigation of plaintiff for workers' compensation fraud and supervisor's ridicule of plaintiff for filing lawsuit did not constitute adverse employment action).

[15]Indeed, elsewhere in her brief, plaintiff admits that other custodians terminated for

(continued...)

plaintiff cites of any other custodians filing workers' compensation claims involves an employee named Don Koeller. Koeller testified that the school district disputed his claim, and that he resigned as part of a settlement with the district. Koeller Dep. at 47-48. There is no evidence that Koeller was fired.

Third, plaintiff argues that Vera imposed an "outrageous and unlawful 100 % capacity requirement" on her before allowing her to return to work after an absence. Brief in Opposition at 31. Plaintiff assesses that this was because she had taken workers' compensation leave, and that no other employees were subjected to such a requirement. However, once again, the evidence to which plaintiff cites does not support her argument that she was treated differently because she had filed a workers' compensation claim. The "100% capacity" requirement seems to have had its origin in a memo to plaintiff from a former supervisor dated January 5, 2001. (This memo was not prepared by Vera, who was not yet employed by the district at the time.) The memo documents a number of reprimands plaintiff had been issued for leaving work early, in addition to one instance where plaintiff left a voice mail message that she was going to miss work in order to have surgery. The memo also documents that plaintiff was expected "To bring in doctor's excuse stating that you are able to return to work at 100% capacity without any limitations. As of January 5, 2001, you will be required to bring in a Doctor's excuse EACH time you use a sick day." Def. Ex. D, Pl. Ex. 3. Later, after plaintiff missed work on two days in September, 2004 and brought in doctors' notes that bore dates which did not coincide with plaintiff's absences, Vera repeated prepared a memo to plaintiff on October 1, 2004 reminding

_____

[15](...continued)
attendance issues had a combination of both attendance and performance problems. Brief in Opposition at 20.

her of the January 5, 2001 admonition and stressing the "seriousness" of the issue.  Defendants'

Exhibit I, Pl. Ex. 30.

The January 5, 2001 memo predated the workers' compensation claims which plaintiff

filed in 2002 and 2003, and therefore could not possibly have been an act of retaliation for the

later filing of those claims.   In addition, the evidence clearly shows that Vera's October 1, 2004

memo was precipitated by plaintiff missing work the previous month and providing suspect

doctors' notes to document her alleged "sick" days.  The evidence also shows that the applicable

collective bargaining agreement permitted River Valley to request medical certification showing

that an employee was able to return to his or her job, and that the district imposed this

requirement on employees other than plaintiff.  Defendants' Exhibit M; Koeller Dep. (Exhibit U)

at 18-20.  In sum, plaintiff's unsubstantiated argument that "outrageous and unlawful"

requirements were imposed on her is not supported by the evidence.[16]

Finally, plaintiff argues that because she was an "excellent employee," she must have

been terminated for an unlawful motive, which was in part because she had filed workers'

compensation claims.   There is evidence that plaintiff generally did a good job cleaning the

---

[16]In her complaint, plaintiff also alleges that after she returned to work on what she deems "light duty," she was, "unlike another similarly situated person," assigned to "hall monitor duty in lieu of returning to work in light duty as a custodian." First Amended Complaint at 3, ¶s 17, 21.  It is not clear what claim or claims this allegation is intended to support, although it would seem to be directed not to her WDCA claim but rather to her gender discrimination claim under the ELCRA.  Assuming that to be the case, the defendants have presented evidence that custodian Don Koeller was treated *less* favorably than plaintiff, to the extent that he was not permitted to return to work while he was on a light duty restriction.  Koeller Dep. (Exhibit U) at 17-20.  Plaintiff, in contrast, was permitted to return to work – presumably at full pay – performing less physically demanding duties, with the approval of her doctor.  Although plaintiff would apparently have preferred to remain off work and receive benefits in lieu of pay, her subjective preference does not establish that she was treated less favorably than Koeller.

school building – that is, when she actually reported for work.  However, there is also abundant

evidence that plaintiff had a record of excessive absenteeism – apart from any protected leave –

and that she was fired for this absenteeism and other attendance-related problems.  There is also

evidence that the applicable collective bargaining agreement provided that excessive

absenteeism was a basis for immediate discharge, and that other employees were fired for

attendance-related reasons.  The evidence is insufficient as a matter of law to support a finding

that plaintiff's filing of workers' compensation claims – long before she was fired – was a factor

in her termination.


## B

## PWDCRA

As noted above, plaintiff assesses that it was "outrageous and unlawful" to impose a

requirement that she be able to return to work at "100 % capacity" after a medical-related

absence.  This argument is also reflected in plaintiff's allegation that the defendants violated

Michigan's PWDCRA by imposing a requirement that she document her medical absences and

establish that she was able to return to her job.  The defendants argue that plaintiff cannot show

that she was disabled for purposes of a claim under this statute.

The PWDCRA prohibits an employer from discharging or otherwise discriminating

against a person with respect to employment "because of a disability . . . that is unrelated to the

individual's ability to perform the duties of a particular job or position."  M.C.L. 37.1202(b).  To

establish a prima facie case of discrimination under the statute, a plaintiff must show that (1) she

has a disability as defined by the statute; (2) the disability is unrelated to her ability to perform

36

the duties of her job; and (3) she was discriminated against because of her disability in one of the ways prohibited by the statute.  Kerns v. Dura Mechanical Components, Inc., 618 N.W.2d 56, 62 (Mich. Ct. App. 2000); Chiles v. Machine Shop, Inc., 606 N.W.2d 398, 405 (Mich. Ct. App. 1999).  The plaintiff must prove these elements by a preponderance of the evidence; only after plaintiff has done so does the burden then shift to the employer to articulate a legitimate, nondiscriminatory reason for its decision.  Kerns, 618 N.W.2d at 62.[17]

Whether the plaintiff suffered from a "disability" is the threshold question the court must consider.  See Chiles, 606 N.W.2d at 405 ("Before a court can address a plaintiff's ability to perform his job, any alleged discrimination and certainly any pretext for the 'discrimination,' the plaintiff must establish that he is the type of person to which the statute was meant to pertain – a person with a 'disability'").   The PWDCRA defines "disability" as including one or more of the following:

> (I) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> (A) For purposes of article 2 [employment discrimination], substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

---

[17]In interpreting provisions of the Handicappers' Civil Rights Act – the predecessor to the PWDCRA – the Michigan Supreme Court has considered analogous federal precedents "persuasive, although not necessarily binding."  Chmielewski v. Xermac, Inc., 580 NW2d 817, 821 (Mich. 1998).  Michigan courts have also held that the prima facie elements and burden-shifting analyses applicable to the Michigan civil rights statutes and federal civil rights statutes are similar.  E.g., Kerns, 618 N.W.2d at 62.   Therefore, the court has considered analogous federal precedents decided under the federal Americans with Disabilities Act ("ADA") in determining the law applicable to plaintiff's state law claim.

       (ii) A history of a determinable physical or mental characteristic described in subparagraph (I).

       (iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (I).

M.C.L. 37.1103(d).   "Major life activities" have been defined as  "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  Chiles, 606 N.W.2d at 407.   "Thus, any 'substantial limitation' suffered by an allegedly disabled individual must relate to one of these activities."  Id. (footnote omitted). In addition, the word "substantial" "clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 196-197 (2002).  "[A]n individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Id., 534 U.S. at 198.  It is not enough for the plaintiff to assert diminished capacity; instead, the plaintiff must provide "'some evidence beyond the mere existence and impact of a physical impairment.'"  Chiles, 606 N.W.2d at 406; see Toyota, 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment").

     "[A]n impairment cannot be 'substantial' if it is of a merely temporary nature."  Chiles, 606 N.W.2d at 409.  In addition, "the inability to perform a *particular* job does not constitute a substantial limitation."  Id. at 407.  The intent of Michigan's legislature "was that disability discrimination claims be available only to those with characteristics that are *not* commonplace and are not directly related to ability to do the job."  Id., 606 N.W.2d at 409.

38

The defendants argue that there is no evidence that plaintiff was suffering from a disability when she was fired.  At most, they contend, she was suffering from mild depression, for which her doctor only took her off work for two days.  Rather than responding to this argument, plaintiff has chosen to ignore it.  Plaintiff's choice to ignore this argument causes the court to conclude that no genuine issue of fact remains that plaintiff was not a person with a "determinable physical or mental characteristic" which "substantially limits" one or more "major life activities" as required by the PWDCRA.  The court also concludes that there is no genuine issue regarding whether plaintiff had a history of such an impairment.

Plaintiff does argue that she nonetheless suffered from a "disability" as required by the statute because the defendants "perceived her to be disabled – a liability risk."  A person is regarded as having a disabling impairment "if others treat her as if she is disabled."  Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir.1998).  Plaintiff contends that the district was concerned about her reinjuring herself and filing another workers' compensation claim, and that this concern justifies her recovery under the PWDCRA.  However, plaintiff not only offers no evidentiary support for this argument – she also offers no viable legal support for it.  The only case which plaintiff cites in support of her argument, Morris v. Clawson Tank Co., 561 N.W.2d 469 (Mich. Ct. App.1997), was reversed on appeal.  587 N.W.2d 253 (Mich. 1997).  In addition, in that case there was no dispute that the employee had a  disability; he had lost an eye in a non-employment related incident.  Even if dicta in Morris' reversed decision did have any precedential value, here the testimony shows that River Valley wanted its employees to document their absences and their ability to return to work in order to prevent repetitive injuries.  The court fails to comprehend how such risk-averse behavior on the part of an employer

39

translates into an inference that plaintiff's employer regarded her as disabled.  "A request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired."  Cody, 139 F.3d at 599.  Employers need to be able to use reasonable means to prevent workplace injuries without exposing themselves to claims of disability discrimination.

Plaintiff has shown neither that she was disabled nor that her employer regarded her as such.  Because the existence of a statutorily-defined disability – which may include "being regarded" as having a disability – is a requirement for discrimination claims under the PWDCRA, the absence of a triable issue with regard to disability requires the court to grant summary judgment in favor of the defendants on this claim.

## C

## ELCRA

Plaintiff has asserted gender discrimination claims under the ELCRA, which include claims of disparate treatment, sexual harassment, and – at least nominally – retaliation. The defendants' motion  attacks plaintiff's sexual harassment and gender discrimination claims, and – by way of reply – also plaintiff's retaliation claim.

## 1.

## SEXUAL HARASSMENT

The ELCRA defines sexual harassment as

. . .  unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:

40

* * *

       (*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment[.]

       (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, . . . or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

M.C.L. § 37.2103(i)(*ii*) and (*iii*).[18]   This provision is "specifically designed to outlaw two forms of sexual harassment: hostile work environment sexual harassment and 'quid pro quo sexual harassment.'"   Champion v. Nationwide Sec., Inc.., 545 N.W.2d 596, 599 (Mich. 1996) (citation omitted).  The court will address each form of harassment separately below.

    At the outset, the ELCRA requires proof of "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature[.]" M.C.L. 37.2103(i).  "It is clear from this definition of sexual harassment that only conduct or communication that is sexual in nature can constitute sexual harassment, and thus conduct or communication that is gender-based, but that is not sexual in nature, cannot constitute sexual harassment."   Haynie v. State of Michigan, 664 N.W.2d 129, 135 (Mich. 2003) (footnote omitted).  Therefore, as a threshold matter, in order to establish actionable sexual harassment

---

[18]As they have with the PWDCRA, Michigan courts have looked to federal precedent for guidance in reaching decisions in discrimination cases under the ELCRA, although they do not necessarily feel compelled to follow that precedent.  E.g., Radtke v. Everett, 501 N.W.2d 155, 162 (Mich. 1993); see Pena v. Ingham County Road Comm'n, 660 N.W.2d 351, 358 (Mich. Ct. App. 2003) ("It is well-settled that when the language of the [ELCRA] and Title VII are substantially similar, our courts consider federal case law interpreting Title VII to be persuasive, albeit not binding, authority on issues brought under the [ELCRA]").

under a quid pro quo theory or hostile work environment theory, a plaintiff must show "conduct

or communication that *inherently* pertains to sex." Corley v. Detroit Bd. of Educ., 681 N.W.2d

342, 345 (Mich. 2004) ("actionable sexual harassment requires conduct or communication that

*inherently* pertains to sex") (footnote omitted).  Harassment that is not sexual does not satisfy the

threshold requirement of the statute.  Id. at 346.  However, alleged romantic overtures are

"inferentially sexually motivated" and are sufficient to meet the minimum prima facie showing

necessary to establish that the conduct in question was based on sex.  Radtke v. Everett, 501

NW2d 155, 163 (Mich. 1993).

The defendants deny that Vera either sexually harassed plaintiff or that he was even

romantically interested in her.  In her response to the defendants' motion, plaintiff argues that

Vera was terminated from a previous employer for sexually harassing a female co-worker.

Plaintiff also argues that while employed at River Valley, Vera kissed a female teacher.  (This

alleged kiss – unwanted by the teacher – took place during non-work hours at a private

residence.)  Although plaintiff has submitted evidence supporting each of these incidents, Vera

denies that either episode of alleged harassment took place.  Plaintiff argues that these incidents

are relevant to her own claims under the ELCRA.

The defendants have filed a separate motion *in limine* challenging the admissibility of

this "other act" evidence.  The court has issued a ruling granting that motion.  Therefore,

evidence of these other incidents is not admissible in this action.[19]  A party opposing a motion

---

[19]The court's order in limine also ruled that evidence indicating that Vera was fired from a job
for drinking during work hours is inadmissible.  Although plaintiff makes brief mention of this
evidence at the outset of her brief in response to the current motion, she at no point indicates
why this evidence is relevant to creating a genuine issue of material fact on any of her claims.

for summary judgment cannot use inadmissible evidence to create a genuine issue of material

fact.  Sperle v. Michigan Dept. of Corrections, 297 F.3d 483, 495 (6th Cir. 2002).

But even if the court had found plaintiff's "other acts" evidence to be admissible, this

evidence would not save her from summary judgment.  Plaintiff relies on these other incidents to

support her own credibility, as some sort of confirmation that she is being truthful about Vera's

expressions of romantic interest in her.  However, as noted in Part II of this decision above, the

court is prohibited from making credibility determinations on a motion for summary judgment.

What the court must instead do is to view the properly supported facts in the light most favorable

to the plaintiff.  In this regard, the following is what plaintiff's "Counter Statement of Facts"

asserts, in pertinent part, with respect to plaintiff's alleged sexual harassment by Vera:

> In late 2001 Mr. Vera asked [plaintiff] to date him, despite that he directly
> supervised [her].  [Plaintiff] turned him down in no uncertain terms.  Despite that,
> Mr. Vera continued to express interest in [plaintiff], including asking her to meet
> him outside of work for dates or drinks or both.  He also repeatedly suggested to
> her that she gets wild when she goes out and drinks.  Furthermore, Mr. Vera
> frequently required [plaintiff], who generally worked the 10:00 p.m. to 6:30 a.m.
> third shift, to give him a wake up call at home because he wanted to hear her
> voice.  This is despite that in 2001 Mr. Vera had married a teacher whom he
> supervised and dated at the school in 2001.  He, moreover, exhibited a possessive
> and jealous streak as regards [plaintiff], demanding that she not talk to other men
> at work. . . .

Brief in Opposition at 2.

The court has reviewed those portions of plaintiff's deposition testimony to which she

cites in support of these statements.  Plaintiff rather broadly cites to pages 72-100, and to pages

136-145 of her testimony.  A review of what these pages say reveals the following:

1.    In September or October, 2001, Vera, who was at the time either

43

unmarried or going through a divorce, asked plaintiff to out for drinks with him.  Plaintiff declined.  Plaintiff's Dep. at 76.

2.     During the fall of 2001, Vera asked plaintiff if she "did go out and stuff."  Plaintiff replied that she did go to a local establishment, O'Malley's, "every so often," but that she very rarely drank.  Vera inquired as to why, and surmised that plaintiff got "wild" when she drank.  Vera also stated, "One of these days we're gonna have to go out and have a couple drinks together."  Plaintiff said, "Nah, I don't think so."  Id. at 77.

3.     Around this same time period, plaintiff encountered Vera at O'Malley's.  Vera, who was accompanied by his then-wife, offered to and did buy plaintiff a drink, even though plaintiff indicated that she was not drinking.  Id. at 77-78.

4.     In October, 2004, plaintiff was cleaning Vera's office.  Plaintiff asked Vera whether he and his wife were going the view an eclipse that night.  Vera replied that he did not know what his wife was doing, and he did not care.  He then proceeded to tell plaintiff that if the head custodian job ever became available, he would give the position to plaintiff because she was "a bitch," but "in a good way."  Vera stated, "you get the job done. . . if I ask you to do something."  Vera also promised that "one of these days you're gonna really know how I feel about you."  Id. at 80-81.

5.     Later during that same shift, Vera radioed to tell all of the custodians good night.  While he was on the radio, Vera asked plaintiff's uncle Don Koeller, who was also employed at the school, whether plaintiff got "wild during the eclipse."  Id. at 82-83.  Plaintiff apparently overheard this statement on her own two-way radio.[20]

---

[20]Plaintiff has apparently testified that while she was working daytime hours, Vera would sometimes contact her at work through a two-way radio she carried during her shift.  However, as the defendants have noted, there is evidence that Vera also contacted the male custodians by radio.  For instance, plaintiff's own testimony confirms that Vera contacted all of the custodians to say good night.  Plaintiff's Dep. at 82.  This would appear to be consistent with testimony by other male custodians that Vera had a habit of contacting them by radio.  For instance, the testimony of Darrell Thompson, provided by plaintiff, indicates that Vera contacted him by radio multiple times per day, sometimes just to engage in casual conversation.  Thompson Dep. at 18.  In addition, testimony by Bruce Burnett, provided by both plaintiff and the defendants, indicates

(continued...)

6.      Plaintiff believed that Vera wanted to use her to make his wife jealous.  In 2002 or 2003, Vera asked plaintiff to put her arm in his and accompany him down the school hall.  Plaintiff did so, and Vera took her to the school copy room.  Vera then opened the door to the copy room and yelled to his wife, who was apparently inside, "look, Cherri's [plaintiff's] trying to grab me again."  Id. at 83-84.

7.      Vera told plaintiff that she was no longer allowed to go out to the school bus garage and talk to another employee, Dave York.  Id. at 84.

8.      Vera also told plaintiff that she was no longer allowed to go into the auto shop to talk to Jerry Morgan.  Vera said that if plaintiff needed someone to talk to, she could come to his office and talk to him.  Id. at 85.

9.      In October 2001 or 2002, plaintiff suggested to Vera's children that they have their father take them to a corn maze.  Vera later suggested to plaintiff that the two make a date to take Vera's children to the corn maze.  Id. at 88-89.

10.     In late 2001, Vera asked plaintiff, who was then on third shift, to call and wake him up in the mornings so that he could "hear [plaintiff's] voice."  Plaintiff did so on multiple occasions.  Id. at 144-145.

Based on this review of the supporting evidence, the court concludes – viewing the facts in plaintiff's favor, as it must – that at least some of Vera's verbal communications, as described

---

[20](...continued)
that Burnett he told Vera, who was on the radio "quite a bit," that the custodians could not get their work done if Vera was calling them all the time.  Burnett Dep. (Pl. Ex. and Def. Ex. U) at 24.  Therefore, Vera's calling plaintiff on the radio could not be deemed harassment based on her gender.  See Bowman v. Shawnee State Univ., 220 F.3d 456, 464 (6th Cir. 2000) ("[M]any of the alleged harassing acts cannot be considered in the hostile environment analysis because [the plaintiff] has not shown that the alleged harassment was based upon his status as a male").  Plaintiff does not appear to dispute that the radio contacts in themselves could not be considered sexually harassing, and she pointed to evidence indicating that Vera ever said anything inappropriate to her during these calls – although she does contend that she heard Vera ask Koeller about plaintiff's behavior during the eclipse.

by plaintiff in her cited testimony, were made and could be construed as motivated by plaintiff's gender and therefore inferentially sexually motivated.  Therefore, plaintiff has made the minimum prima facie showing necessary to establish that she was subjected to conduct which was based on sex.[21]

Plaintiff must also show that the sexual communications were unwelcome. Plaintiff also satisfies this element because she alleges that she was subjected to unwelcome sexual conduct or communication.  See Radtke, 501 N.W.2d at 163 ("the gravamen of a Michigan Civil Rights Act sexual harassment claim is that the alleged sexual advances were unwelcome").  "The threshold for determining that conduct is unwelcome is 'that the employee did not solicit or incite it, and the employee regarded the conduct as undesirable or offensive.'" Id. (citations omitted).  In the instant case, viewing the testimony in the light most favorable to plaintiff, she has shown that at least some of the communications were unwelcome, even if others were not.   However, each of her sexual harassment claims requires her to establish additional elements.

**a.**

**Quid Pro Quo Harassment**

Section 37.2103(i)(*ii*) prohibits quid pro quo sexual harassment.  A plaintiff pursuing a claim under this subsection must establish two things: (1) that she was subject to any of the types

---

[21]The evidence shows that whatever plaintiff might have subjectively believed, some of Vera's conduct was not based on plaintiff's gender.  For example, Vera has stated that he never objected to plaintiff talking to other male employees due to a romantic interest, but rather because plaintiff had a habit of visiting with other employees outside of her work area and disrupting their work as well as her own.  Vera has also stated that the reason why he asked plaintiff to call him in the morning, before the end of her 10:00 p.m. to 6:30 a.m. shift, was due to rumors and concerns that plaintiff had been leaving work before the end of her shift.

of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. Chambers v. Trettco, Inc., 614 N.W.2d 910, 915 (Mich. 2000); Champion, 545 N.W.2d at 599-600. A "decision affecting the individual's employment" requires a "tangible employment action," and is an element of quid pro quo harassment that is explicitly required by the statute. Chambers, 614 N.W.2d at 919-920. In addition, "[t]o show quid pro quo sexual harassment, it is not enough to demonstrate harassment and a tangible employment action – there must be a causal relationship between the two." Id. at 920 n.8; see also McCallum v. Department of Corrections, 496 N.W.2d 361, 366 (Mich. Ct. App. 1992) (plaintiff was precluded from recovery on quid pro quo sexual harassment theory due to failure to present evidence of a nexus between harassment and employment reassignment).

The defendants in this case argue that plaintiff's claim of quid pro quo sexual harassment fails because even if plaintiff can establish that Vera verbally expressed a sexual interest in plaintiff, and there is no evidence of causation. Put another way, they argue that there is no evidence that suggesting that Vera fired plaintiff because she spurned his alleged advances. The court agrees.

In her amended pleading, plaintiff alleges, as her quid pro quo harassment claim, only that Vera terminated her because resented her for rejecting his romantic interest. First Amended Complaint at 7, ¶ 52. However, plaintiff has not submitted evidence which supports a finding that plaintiff's rejection of Vera's alleged advances was a factor in his decision to fire her. Even viewing the facts in plaintiff's favor, the only alleged offers by Vera to date plaintiff were made in the fall of 2001, more than three years before he fired her. In addition, even though plaintiff

47

later made telephone calls to wake Vera, she has presented no evidence that Vera ever made any inappropriate comments during the calls.  The evidence is simply too weak to support an inference that plaintiff's rejection of Vera's alleged offers to date plaintiff in the fall of 2001 was a causal factor in his decision to terminate her over three years later, particularly given plaintiff's consistently poor attendance record  – which she has attempted to downplay and justify but not deny.   The court therefore concludes that the defendants are entitled to summary judgment on plaintiff's quid pro quo harassment claim because she has failed to establish a tangible, adverse employment action causally related to the harassment.

**b.**

**Hostile Environment Sexual Harassment**

In order to establish a claim of hostile environment sexual harassment under Michigan law, an employee must prove the following elements by a preponderance of the evidence:

(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5) respondeat superior.

Chambers, 614 N.W.2d at 915; Radtke, 501 N.W.2d at 162.  The court has already addressed the

first three elements above.  The fifth element, respondeat superior, does not appear to be

disputed.  What remain to be considered is whether plaintiff has shown that a genuine issue of

fact remains regarding the fourth required element of her hostile environment sexual harassment

claim  – whether the unwelcome sexual conduct or communication was intended to or in fact did

substantially interfere with the employee's employment or created an intimidating, hostile, or

offensive work environment.

  "The essence of a hostile work environment action is that 'one or more supervisors or co-

workers create an atmosphere so infused with hostility toward members of one sex that they alter

the conditions of employment for them.'"  Radtke, 501 N.W.2d at 163 (citation omitted).

"[W]hether a hostile work environment existed [must] be determined by whether a reasonable

person, in the totality of the circumstances, would have perceived the conduct at issue as

substantially interfering with the plaintiff's employment or having the purpose or effect of

creating an intimidating, hostile, or offensive employment environment."  Id. at 167.  Relevant

circumstances "may include the frequency of the discriminatory conduct; its severity; whether it

is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc.,

510 U.S. 17, 23 (1993).   "The purpose of the act is to combat serious demeaning and degrading

conduct based on sex in the workplace, and to allow women the opportunity to fairly compete in

the marketplace."  Radtke,  501 N.W.2d at 164.  Conduct must be severe or pervasive enough to

create an objectively hostile or abusive work environment, one which a reasonable person would

find hostile or abusive.  Harris, 510 U.S. at 21, 114 S.Ct. at 370.

  The latter requirement has been regarded as "crucial, and as sufficient to ensure that

49

courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory 'conditions of employment.'" <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 81 (1998).  Simple teasing, offhand comments, and isolated incidents – unless extremely serious – will not establish a hostile work environment. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).  The standards for judging hostility are sufficiently demanding to ensure that laws prohibiting discrimination do not become a "general civility code."  <u>See</u> <u>id.</u>; <u>see also</u> <u>Brewer v. Hill</u>, No. 208872, 2000 WL 33407016, *6 (Mich. Ct. App. Sept. 15, 2000) ("Anti-discrimination laws are not to be utilized as a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct").  "Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"  <u>Faragher</u>, 524 U.S. at 788 (citation omitted).

In order to be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  <u>Faragher</u>, 524 U.S. at 787.  "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim. <u>Randolph v. Ohio Dept. of Youth Svcs.</u>, 453 F.3d 724, 733 (6th Cir. 2006).  However, "[t]he work environment as a whole must be considered rather than a focus on individual acts of alleged hostility."  <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 463 (6th Cir. 2000).

The defendants argue that the facts of this case clearly do not support a hostile environment claim.  They argue that at best, this particular claim relies on a handful of

comments, most of which were made by Vera more than three years before plaintiff was terminated.  Plaintiff has simply failed to respond to this argument, other than to recite the required elements of proof.   The court agrees with the defendants that the evidence is insufficient to permit a jury to find that a reasonable person would have perceived Vera's conduct as substantially interfering with plaintiff's employment or creating an objectively intimidating, hostile, or offensive employment environment based on sex.

This is not the rare case in which the plaintiff contends that a single, serious incident created a hostile environment.  Cf. Radtke, 501 N.W.2d at 168 (employer's attempt to physically restrain employee and coerce sexual relations at workplace permitted a jury to determine whether conduct was sufficient to create hostile work environment).  Therefore, the work environment as a whole must be considered, rather than individual acts of alleged harassment.  Bowman, 220 F.3d at 463.  Here, consideration of the totality of the circumstances does not permit a conclusion that the statutory standard is satisfied.

During a large portion of her employment, plaintiff worked as a custodian on the third shift, during a time when Vera, the principal, was presumably not even present at the school and therefore in no position to interfere with plaintiff's work.  Although plaintiff alleges that Vera asked to date her, these invitations – as described by plaintiff – were not in themselves objectively offensive.  Moreover, there is no evidence that Vera had asked plaintiff to date him after the fall of 2001, a full three years before she was fired.   Vera's other behavior, as described by plaintiff, consisted of harmless (if unwelcome) teasing, and the incidents were few and were isolated at best.

Plaintiff has identified no acts by Vera which could be construed as either physically

threatening or even hostile.  Plaintiff does not allege that Vera ever touched her against her will;

what she does allege instead is that on a single occasion, she accepted his offer to put her arm in

his as part of what can only be construed as a harmless attempt by Vera to tease his own wife.[22]

As for plaintiff alleging that Vera told her she was "a bitch," but "in a good way," this cannot be

deemed to provide a basis for a hostile environment claim.  See  Cline v. Michigan Dept. of

Corrections, No. 234714, 2003 WL 1949555, *7 (Mich. Ct. App. April 24, 2003) (being called a

"bitch," being told to "prove it," or being told that one would "never amount to shit" does not

create an intimidating, hostile or offensive work environment).  As for plaintiff's subjective

perception that Vera was jealous of her talking with other men, the defendants have submitted

evidence, with their reply brief, that Vera simply asked plaintiff not to visit the bus garage

because she had no legitimate work-related reason to be there.  Vera Affidavit at 3, ¶ 7.  Plaintiff

admits that Vera never told her that he was jealous of her talking to other male employees.  Pl.

Dep. at 85.  Finally, to the extent that plaintiff has alleged that Vera asked her to call him at

home to wake him, evidence submitted by the defendants with their initial brief indicates that

Vera was concerned about rumors that plaintiff was leaving work in the morning before the end

of her shift at 6:00 a.m.  Vera Affidavit at 4-5, ¶ 14.  Plaintiff herself does not contend that Vera

said anything sexually inappropriate during any of these calls.  In summary, and viewing the

totality of the circumstances in a light most favorable to plaintiff, the court concludes that no

genuine question of fact exists on the fourth element of plaintiff's claim of hostile environment

---

[22]Plaintiff's own testimony indicates that she knew Vera was joking.  She testified that after
she put her arm in Vera's, she asked, "Now what's the joke?"  Pl. Dep. at 83-84.  This statement
and plaintiff's willingness to go along negate any possibility that plaintiff construed Vera's
behavior as threatening.

sexual harassment.  Consequently, the court concludes that the defendants are entitled to summary judgment on the merits of plaintiff's hostile environment sexual harassment claim as a matter of law.

## **2.**

## **RETALIATION**

Count III of plaintiff's amended complaint bears the title "SEXUAL HARASSMENT, RETALIATORY TERMINATION AND SEX DISCRIMINATION."   First Amended Complaint at 7.  The pleading contains no specific factual allegations in support of this claim. Therefore, the defendants – who have taken the position that plaintiff has not pled a claim of retaliation under the ELCRA[23] – have not addressed such a claim in their motion.  Even though the defendants' motion does not attack what they believe to be a non-existent claim, the bulk of plaintiff's motion response directed to her ELCRA claim nonetheless addresses the issue of retaliation.  The defendants have therefore addressed this claim in their reply brief.

Plaintiff's first amended complaint is a fairly typical example of what one court has called a "shotgun complaint," insofar as the pleading contains "several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." Strategic Income Fund v. Spear, Leeds & Kellogg, 305 F.3d 1293, 1295 (11th Cir.2002).   The body of Count III contains only two independent factual allegations: (1) paragraph number 51, in

---

[23]See Final Pretrial Order (proposed) (doc. no. 65) at 17 ("To the extent, plaintiff is claiming retaliatory termination regarding any purported objection to sexual harassment, Defendants submit she did not allege any such claim in her amended complaint").

which plaintiff alleges that she was treated differently from similarly situated men in the circumstances for her termination, and (2) paragraph 52, in which plaintiff alleges that she was terminated for rejecting Vera's romantic overtures.  The former asserts a claim of sex discrimination based on disparate treatment, and the latter asserts a claim of quid pro quo sexual harassment.  Count III contains no allegations indicating either that plaintiff either engaged in activity protected by the ELCRA or that she was terminated because of such activity.  Although Count III does include an initial paragraph, paragraph 50, which contains boilerplate language incorporating all prior paragraphs of the complaint, there are no prior paragraphs of the complaint which contain factual allegations indicating either that plaintiff engaged in activity protected by the ELCRA or that she was terminated because of such activity.

Generally, merely slapping a title on a claim does not take the place of providing factual allegations supporting the claim, even under liberal notice pleading standards.  See Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964 -1965 (2007) (plaintiff's obligation under Fed.R.Civ.P. 8(a)(2) "requires more than labels and conclusions").   The court therefore appreciates the merit of the defendants' position that plaintiff has not properly pled a claim of retaliation under the ELCRA.   However, the usual course in such a situation is for the defendants to either move for a more definite statement under Fed.R.Civ.P. 12(e), or – where the allegations are particularly deficient – for dismissal for failure to state a claim under Fed.R.Civ.P. 12(b)(6).  Here, the defendants did neither.  Moreover, the defendants have now had the opportunity to put meat on the bare-bones label of plaintiff's ELCRA retaliation claim through the discovery process.  For this reason, and because the parties have addressed the substance of this claim in their respective response and reply briefs filed in connection with the summary judgment motion, the court will

address the claim in this decision.

As noted above, the defendants argue that the evidence is not sufficient to support a claim of retaliation under th ELCRA because there is no evidence that plaintiff ever engaged in an activity protected by the statute.  The ELCRA provides that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."  M.C.L. 37.2701(a).   In order to establish a prima facie case of retaliation under this provision, a plaintiff must show (1) that she engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.  Garg v. Macomb County Community Mental Health Services, 696 N.W.2d 646, 653 (Mich. 2005), amended on denial of rehearing (July 18, 2005).

"Although Michigan courts assess claims of retaliation under the ELCRA using the same general framework as that used by federal courts, ... the standard for causation is higher." Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 523 n.2 (6th Cir. 2008) (citation omitted). Michigan courts have held that in order to establish causation, the plaintiff must show that her participation in activity protected by the ELCRA was a "significant factor" in the employer's adverse employment action, not just that there was a causal link between the two.  Barrett v. Kirtland Community College, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).  "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable

fact-finder to infer that an action had a discriminatory or retaliatory basis." Rymal v. Baergen, 686 N.W.2d 241, 257 (Mich. Ct. App. 2004).

Title VII contains a retaliation provision which is virtually identical to the ELCRA in all relevant respects.[24]  In the context of construing Title VII, courts have described the separate clauses of the statute as the "opposition clause" and the "participation clause."  See Johnson v. University of Cincinnati, 215 F.3d 561, 578 (6th Cir.), cert. denied, 531 U.S. 1052  (2000).  This court will therefore use the same terminology.

Here, plaintiff's claim does not arise under the participation clause.  Plaintiff does not allege that she ever filed a civil rights complaint with authorities, nor does she allege that she ever reported any alleged sexual harassment by Vera to school administrators.[25]  She does not allege that she filed a grievance with her union regarding Vera's alleged harassment.[26]  She also

_____

[24]Title 42 U.S.C. § 2000e-3(a) provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . .[or] to discriminate against any individual, . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[25]During her deposition, plaintiff testified that she talked to the superintendent, Janet Burns, about plaintiff's concerns that Vera was treating her unfairly.  However, plaintiff admitted that she did not tell Burns or any other administrators about Vera's alleged romantic advances.  Plaintiff's Dep. at 97-98.  Plaintiff also testified that she did not file any formal complaint alleging retaliation, harassment, or sex discrimination, and she did not talk to any administrators about such a claim.  Id. at 100.

[26]According to her testimony, plaintiff spoke with someone named Jim Kehoe about her situation.  Although plaintiff initially testified that Kehoe was a union representative, she subsequently corrected herself, describing him as a "district type."   Plaintiff's Dep. at 97.  (Later again, however, plaintiff identified Kehoe as being "from the union" when she was asked whether she filed a grievance after her termination.  Plaintiff's Dep. at 101.)  Kehoe, who was

(continued...)

56

does not allege that she complained to Vera that she found his conduct to be sexually harassing.

During her deposition testimony, plaintiff in fact denied ever filing any formal complaint

regarding retaliation or sexual harassment or discrimination.   Plaintiff's Dep. at 100.  Therefore,

because plaintiff has not alleged or shown that she ever made a formal complaint or participated

in a proceeding under the ELCRA, the court concludes that plaintiff did not engage in activity

protected by the participation clause.

The remaining question is whether plaintiff engaged in activity protected by the

opposition clause in the sense that she otherwise "opposed a violation" of the statute.  In her

response brief, plaintiff argues that she "repeatedly opposed" Vera's alleged sexual harassment

by "repeatedly turn[ing] him down for dates and other social outings."  Brief in Opposition at 27.

She also argues that she "complained" that Vera "in effect, was messing with her shifts because

she did not reciprocate his interest in her."  Id.  Finally, plaintiff argues that Vera

> knew and learned about this protected opposition activity.  In fact, [he] was so
> concerned about her opposition that he told others that he believed that [plaintiff]
> was going to sue him for sexual harassment.

Id.  Based on these arguments, the court can discern that plaintiff contends that her protected

"opposition" consisted of the following: (1) her rejection of Vera's alleged advances, and (2) her

"complaining" that Vera was "messing with her shifts."

Before determining whether these actions constitute activity protected by the ELCRA's

opposition clause, the court must first consider whether a genuine issue of fact exists regarding

---

[26](...continued)
not employed at the school, gave plaintiff advice to avoid Vera.  Plaintiff's Dep. at 97.  In the
proposed Final Pretrial Order, plaintiff has not identified Kehoe as a witness.

whether plaintiff actually engaged in these behaviors as she has argued in her brief.  As summary judgment standards require, the court will view the facts of evidence in plaintiff's favor and assume – based on plaintiff's testimony –  that Vera invited plaintiff on at least one social outing and that plaintiff rejected the invitation.[27]   However, under the circumstances, it is not possible to reasonably conclude that plaintiff's rejection of Vera's alleged offer to date her was a significant factor in her termination over three years later.

The evidence to which plaintiff cites in support of her argument that she "complained" about Vera "messing with" her shifts is less straightforward.  Plaintiff's argument that she "complained" about Vera's changing of her work shifts does not specify either the precise nature of this complaint or the person or persons to whom plaintiff directed the complaint.  Therefore, the court looks to two record cites which plaintiff has inserted immediately following this statement in her brief.  These record cites include several pages of both plaintiff's own deposition testimony and the testimony of another River Valley custodial employee, Bruce Burnett.

Plaintiff cites to pages 85 through 87 of her own testimony in support of her argument that she "complained" about Vera's changes of her shift.  However, none of these pages support plaintiff's argument about making a complaint at all, and certainly not one related to his alleged sexual advances.   Instead, at page 86 of her deposition, plaintiff merely testified that Vera "kept changing" her shifts, even though she told him that she "couldn't work anything but third shift,

---

[27]For present purposes, the court will also assume that Vera's invitation inherently pertained to sex, as required by the statute, even though plaintiff has pointed to no evidence that Vera asked her to have sex.  See Corley v. Detroit Bd. of Educ., 681 N.W.2d 342, 345 (Mich. 2004) ("actionable sexual harassment requires conduct or communication that *inherently* pertains to sex").

because then I wouldn't be able to spend time with my daughter."

Plaintiff also cites to pages 97 through 100 of her own testimony in support of her argument that she "complained" about Vera's changes of her shift.   These pages of her testimony reveal that although plaintiff spoke to district superintendent Janet Burns about Vera "being mean" to her, in terms of shift changes, plaintiff admitted that she never told Burns about Vera's alleged sexual advances.   Although these pages also indicate that plaintiff spoke with another "district type" about Vera's treatment of her, there is likewise no mention of whether plaintiff told this person she felt she was being sexually harassed.

The only pages of plaintiff's deposition which support her argument that she "complained" about Vera's alleged harassment consist of pages 99 and 100.   During this portion of her testimony, plaintiff was asked whether she ever reported to anyone that she thought Vera was discriminating against her.   Plaintiff identified Bruce Burnett and Darrel Thompson. Thompson was the high school's head custodian; Burnett was the district's building and grounds supervisor.   Although plaintiff did not indicate what she told Thompson, she testified that she told Burnett

> that Mr. Vera had asked me out, and I thought the reason why he was changing my shifts and stuff was to upset me so I couldn't spend time with my daughter and stuff. . . .   And I said, I have, I've told Mr. Vera he had to stop, that, you know, stop riding me for things and stop being mean to me, because he didn't have a right to be. . . .

Plaintiff's Dep. at 99-100.   Plaintiff could not remember when she spoke to Burnett.

Thompson's testimony does not support plaintiff's argument that she told him Vera was harassing her.   Instead, Thompson testified that he heard that plaintiff was planning on suing

59

Vera, Burnett, and even Thompson himself for sexual harassment.  Thompson Dep. at 28.

According to Thompson, this was "just a rumor" which he probably heard about from Vera.  Id.

at 28-29.   According to Burnett, he heard the same rumor, at around the same time there was

discussion about changing plaintiff's shift.  Burnett Dep. at 14.  Instead of ignoring the rumor, as

Thompson apparently did, Burnett testified that he brought the rumor to Vera's attention.

According to Burnett, he and Vera  met with plaintiff to discuss the rumor.  However, plaintiff

informed them that the rumor was "unfounded or something to that nature."  Id. at 15.  Burnett

testified that his recalled the meeting with plaintiff having taken place approximately one and

one-half years before plaintiff's termination.  Id. at 31.  Burnett also testified that he knew

plaintiff was upset about her shift being changed, but she never complained that Vera was

romantically interested in her.  Id. at 22, 24.  In addition, and notably, plaintiff does not point to

evidence that she herself was the source of the "rumor" (whether based in fact or unfounded) that

she planned to sue for sexual harassment.

Plaintiff argues that Vera terminated her because he wanted to avoid an "internal"

investigation into her purported allegations of sexual harassment.  The court agrees that

termination of plaintiff's employment is a materially adverse action.  In addressing whether such

action could be deemed retaliatory, the court also assumes – despite evidence to the contrary –

that plaintiff held a good faith belief that Vera's "messing with" her shifts was a violation of the

ELCRA.[28]  However, the court concludes that plaintiff has not shown that a reasonable jury

--------

[28]Assuming that plaintiff, or anyone else, for that matter, had merely circulated a false rumor
that plaintiff planned to sue for sexual harassment, this would not establish that plaintiff had a
good faith belief that she had been subjected to an employment practice made unlawful by the
ELCRA.  But of course, at the present juncture the court views the facts in the light most

(continued...)

could find that an unsubstantiated rumor that plaintiff intended to sue was a significant factor in her termination, which occurred – by Burnett's account – approximately one and one-half years after plaintiff was confronted about the rumor.  This is simply too long a period to support an inference of a causal connection.   See Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 550 (6th Cir. 2008) ("In this circuit, a period of more than four months was found to be too long to support an inference of causation").

Plaintiff also argues that she was terminated "within about two months of her last objection to sexually harassing statements by [Vera]."  Brief in Opposition at 28.  In making this argument, plaintiff is apparently referring to Vera's alleged question to Don Koeller about plaintiff getting "wild" during the eclipse.  Plaintiff has not pointed to evidence that she either voiced objections to anyone about Vera's alleged comments about the eclipse, or more specifically that she complained that Vera's comments constituted sexual harassment.  An employee must do more than subjectively object to allegedly harassing conduct.  See Garg, 696 N.W.2d at 654-656 (no reasonable juror could conclude that employee engaged in protected activity by simply striking co-worker who touched her).  Moreover, merely complaining about conduct without couching it in terms of sexual harassment does not amount to protected activity. See Watts v. Kroger Co., 170 F.3d 505, 511 5th Cir. 1999) (district court was correct in holding that no reasonable juror could find that plaintiff was engaged in protected activity during meeting in which she complained to store manager that supervisor "was making comments about her personal life and that she wanted the conduct stopped").  Because plaintiff has pointed to no

---

[28](...continued)
favorable to the plaintiff.

61

facts permitting a reasonable inference that she engaged in protected activity in connection with Vera's radio comments to Koeller during the fall of 2004, she has created no genuine issue of fact on any retaliation claim based on her "objection" to this incident.

Plaintiff's brief also expressly identifies Vera's alleged "messing with her shifts" as retaliatory.  Therefore, the question is whether this constituted materially adverse action within the meaning of the law.  The adverse employment action must be  (1) "materially adverse in that it is more than 'mere inconvenience or an alteration of job responsibilities,'" and (2) "must have an objective basis for demonstrating that the change is adverse, rather than the mere subjective impressions of the plaintiff."  Meyer v. Center Line, 619 N.W.2d 182, 188 (Mich. Ct. App. 2000) (quoting Wilcoxon v. Minnesota Mining & Mfg. Co., 597 N.W.2d 250 (Mich. Ct. App. 1999)). "Although there is no exhaustive list of adverse employment actions, typically it takes the form of an ultimate employment decision, such as 'a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'"  Pena v. Ingham County Road Comm'n, 660 N.W.2d 351, 358 (Mich. Ct. App. 2003) (citations omitted).  "In determining the existence of an adverse employment action, courts must keep in mind the fact that '[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.'" Id. at 358-359 (citation omitted); see also Burlington Northern and Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006) ("We speak of material adversity because we believe it is important to separate significant from trivial harms. . . .  An employee's decision to report discriminatory behavior

62

cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience").

Whether a particular action is materially adverse "depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Burlington Northern,126 S.Ct. at 2417 (quoting Oncale, 523 U.S. at 81).   Reference is made to the reactions of a reasonable employee because the standard for judging harm must be objective.  Burlington Northern,126 S.Ct. at 2415.  "An objective standard is judicially administrable" and "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  Id.  However, the standard must be applied "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."  Id.  For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."  Id.  In contrast, a plaintiff's subjective perception that she has been adversely affected by something her employer has done does not alone suggest an objectively verifiable employment action.  Pena, 660 N.W.2d at 360; Meyer, 619 N.W.2d at 188.

Here, plaintiff has not alleged that changing her work hours altered her duties, status, or pay.  Generally, a shift change alone does not constitute an adverse employment action. Lowande v. Department of Corrections, No. 210164, 1999 WL 33435766, *3 (Mich. Ct. App. Sept. 17, 1999).  If plaintiff merely desired to work the night shift because she preferred to work alone and unobserved, this would not provide an objective basis for demonstrating that changing her shift was adverse.  On the other hand, if plaintiff was a single mother and could point to

63

objective reasons why working a different shift had a negative impact on her situation, then she might be able to establish that a shift change was adverse.

However, for present purposes the court will view the facts in plaintiff's favor and assume that plaintiff will be able to prove that "messing with" plaintiff's work shift was a materially adverse action within the meaning of the law.   The court will also assume – notwithstanding Burnett's testimony to the contrary – that plaintiff "complained" to Burnett about her shift being changed by Vera *because* she refused his offer to go on a date.[29]   Does this latter act constitute activity protected by the ELCRA's opposition clause as a matter of law? The court concludes that it likely does not.

In the context of construing the ELCRA's opposition clause, the Sixth Circuit has recognized that this clause, like the same clause contained within its federal counterpart, does not protect all opposition activity.  Booker v. Brown & Williamson Tobacco Co., Inc.  879 F.2d 1304, 1312 (6th Cir. 1989).   However, even though the opposition clause's protection is less broad than that afforded by the participation clause, a person opposing an apparently discriminatory practice must only have a good faith belief that the practice is unlawful.  Id. at 1312-1313.  In Booker, the court concluded that an employee who drafted a letter blaming his performance difficulties on his supervisor did not engage in protected opposition activity because he was not contesting any unlawful employment practice, but instead merely

---

[29]Certainly, if plaintiff complained to Burnett or anyone else about a mere labor issue, such a complaint would fall far short of warranting protection by the opposition clause.  Bell v. Safety Grooving & Grinding, LP., No. 03-3902, 2004 WL 1922170, *3 (6th Cir. Aug. 24, 2004).  A complaint about an employment situation which does not suggest gender discrimination does not constitute opposition to a violation of the ELCRA, as required by the express language of M.C.L. 37.2701(a).

questioning the correctness of a decision made by his employer.  (In the letter, the plaintiff wrote

that his supervisor had stated, in referring to black persons, had said "I don't know if these

people can comprehend asset management."  The plaintiff also complained that "this is a case of

ethnocism [sic], which should be investigated immediately."  Id. at 1309.)  According to the

court in Booker, the plaintiff's "vague charge of discrimination" was insufficient to constitute

opposition to an unlawful employment practice.  Id. at 1313.  (The court went on to hold that

even assuming that the plaintiff did "oppose" an unlawful employment practice, he had failed to

show that his opposition was a significant factor in an adverse employment decision.  A single

judge on the panel, who concurred in the decision, offered his "initial impression" that the

plaintiff "may have 'opposed' what he construed as conduct that would [violate the ELCRA]."

Id. at 1314.

Since Booker was decided, a panel of the Michigan Court of Appeals has expressed

disagreement with the majority's interpretation of the ELCRA's opposition clause in that case.

See McLemore v. Detroit Receiving Hosp. and University Medical Center, 493 N.W.2d 441, 443

(Mich. Ct. App. 1992) ("We strongly disagree with this interpretation of the act.  Regardless of

the vagueness of the charge or the lack of formal invocation of the protection of the act, if an

employer's decision to terminate or otherwise adversely effect an employee is a result of that

employee raising the spectre of a discrimination complaint, retaliation prohibited by the act

occurs").  However, regardless of whether Michigan courts choose to reject Booker's

interpretation of the Michigan statute, the court concludes that plaintiff has not shown that a

reasonably jury could find that plaintiff's rejection of Vera's alleged advances was a significant

factor in her shift being changed.

Although there is case law which supports a conclusion to the contrary, the court also assumes – without deciding – that plaintiff's mere rejection of Vera's alleged advances alone constitutes protected activity under the ELCRA's opposition clause.  Compare Monteagudo v. Asociacion de Empleados Del Estado Libre Asociado de Puerto Rico, 425 F.Supp. 2d 206, 212-213 (D.P.R. 2006) (holding that plaintiff's rejection of unwanted sexual advances did not constitute a protected activity for purposes of a retaliation claim under Title VII, observing that "[n]either the First Circuit, nor any other circuit, has ruled on whether resisting an employer's sexual advances constitutes protected activity for purposes of establishing retaliation") with Roberts v. County of Cook, No. 01 C 9373, 2004 WL 1088230, *4-5 (N.D. Ill. May 12, 2004) (discussing case law and concluding, in granting motion for new trial after verdict in favor of the plaintiff on retaliation claim, that a reasonable jury could find that the plaintiff's repeatedly resisting her supervisor's sexually harassing behavior and consequential reduction of her job responsibilities established retaliation).  In this case, there is simply no evidence supporting a causal connection between any alleged opposition activity by plaintiff and changes in her work shift.

Here, even assuming that plaintiff adequately complained to Burnett about being sexually harassed, the evidence – apart from plaintiff's own subjective argument – does not support her contention that Vera "messed" with the timing of plaintiff's shifts because she either rejected Vera or complained to Burnett.  A causal connection can be established through circumstantial evidence, such as a close temporal proximity between the protected activity and adverse actions.  Rymal, 686 N.W.2d at 257; see Imwalle, 515 F.3d at 550 (employee's termination less than three months  after he filed complaint with Equal Employment Opportunity

Commission supported inference of a causal connection).  However, plaintiff has not pointed to any evidence of a close temporal proximity between her alleged protected activity and any shift change.

Plaintiff's time cards indicate that plaintiff's work hours changed a number of times during her employment.  Defendants' Exhibit A.  Specifically, although plaintiff began working a 10:00 to 6:30 shift at the outset of her employment in March, 2000, her schedule changed during the summer months, when school would presumably not be in session.[30]  During the first summer of her employment in June, 2000, plaintiff appears to have begun working a shift which ran from approximately 6:00 to 2:30.  (It is unclear whether this is a.m. or p.m.)  Plaintiff's 10:00 p.m. to 6:30 a.m. schedule did not resume until the latter part of August, 2000.  Plaintiff's hours again changed between June and August, 2001 and June and August, 2002, after which it appears that plaintiff was on worker's compensation leave.  When plaintiff's time cards resume in August, 2003, plaintiff appears to have worked for a week at various times (minus one "sick day"), and then begun working a shift beginning at approximately 3:00 p.m. (These time sheets begin reflecting military time.)   In October, 2003, plaintiff appears to have worked a number of shifts beginning at approximately 10:00 p.m.   However, she again went on worker's compensation leave beginning later that month.  When plaintiff's time cards resume in November, 2003, they reflect a work schedule beginning at approximately 7:00 a.m.  Once again, plaintiff's hours changed in the summer of 2004; her time cards for this period show her beginning work at approximately 6:00 a.m.  Beginning in September, 2004, plaintiff began

---

[30]According to the district's former head custodian, Darrell Thompson, all of the custodians worked days during spring break, Christmas break, and summer.  Thompson Dep. at 8-9.

working at approximately 10:30 p.m.  This changed once again in October, 2004 to approximately 3:00 p.m.  However, in November, 2004 plaintiff began working a 10:00 a.m. shift.  This lasted until plaintiff was terminated in December, 2004.

Even if these variations in plaintiff's schedule were frustrating to plaintiff, the timing of them simply does not permit a reasonable inference that any of them were retaliatory in nature. Plaintiff has alleged that Vera did not even begin working for River Valley until June, 2001. According to her own pleadings, Vera did not ask plaintiff to date him until late 2001.  By that time, plaintiff's schedule had already been changed during the summers of both 2000 and 2001. Therefore, even though plaintiff's hours changed again in the summer of 2002, because this had occurred twice before Vera became plaintiff's supervisor, no reasonable person could infer that the change in the summer of 2002 was attributable to plaintiff's rejection of Vera, or to any complaint she made about it to Burnett.

Moreover, plaintiff was off work on worker's compensation leave beginning in the fall of 2002.  It is presumably for this reason that there are no time cards reflecting actual work by plaintiff for the period between August, 2002 and August, 2003.  Subsequent to this period, plaintiff's schedule did indeed fluctuate more.  However, this is readily explained by circumstances other than plaintiff's alleged rejection of Vera in late 2001.   One key circumstance is that when plaintiff returned to work in the fall of 2003, she was on – according to her own pleadings – "light duty" following her return from workers' compensation leave.  In addition, according to evidence submitted by the defendants, the district had been forced, during plaintiff's absence, to reassign plaintiff's duties to persons on different shifts; as result, it was discovered that the work could be accomplished more effectively without a third shift custodian.

68

Affidavit of Jose Vera (attached as Exhibit C to Defendants' Reply Brief), ¶ 2.  There is also evidence indicating that plaintiff's supervisors questioned whether she could be trusted working alone on the night shift.  According to Vera, there were rumors that plaintiff had been seen at a local bar at a time when she was supposed to be working third shift, and at times it was apparent that plaintiff had not completed all of her duties.  Id., ¶ 4.[31]  There is further evidence that although Vera permitted plaintiff  – at her request –  to work third shift for a brief period during the fall of 2004, it was deemed necessary to move plaintiff to second shift after another custodian working that shift left the district's employ.  Finally, there is ample evidence supporting the defendants' position that by the time plaintiff was terminated, she had a long history of documented absenteeism, apart from any absences protected by law; in fact, plaintiff was terminated immediately after she missed work for an entire week in December, 2004.  In summary, there is evidence supporting the existence of legitimate reasons why plaintiff's shift changed, but no evidence – apart from plaintiff's own subjective feeling – of any reason for these changes which would violate the ELCRA prohibition against retaliation.  Therefore, the court concludes that plaintiff has not created a genuine issue of fact supporting a causal connection between any alleged protected activity and either her shift changes or her termination, and she has consequently failed to establish a prima facie case of retaliation.

Finally, even if the court assumes for the sake of argument that plaintiff did establish a

---

[31]Testimony provided by River Valley's former head custodian, Darrell Thompson, confirmed the existence of a rumor that plaintiff was seen at a local bar during her work hours.  Thompson Dep. at 21-22.  According to Thompson, there were also rumors  (1) that plaintiff's boyfriend had come to the school after he had been drinking and vomited on the premises, and (2) her boyfriend's son came to the school one night and broke his toe in the school cafeteria.  Id. at 23-25.

prima facie case of retaliation, her this claim still fails under the applicable burden-shifting framework.  Cases brought under the ELCRA are analyzed under the same evidentiary framework used in Title VII cases.   Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004).  Under this framework, if the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for the employment action.  If the defendant does provide such a reason, the plaintiff must then produce evidence that the defendant's proffered reason is a pretext for discrimination.  Id.

Here, the defendants have provided legitimate business reasons for both plaintiff's schedule change and her termination, and plaintiff has failed to proffer any evidence that these reasons were simply a pretext designed to mask retaliation unlawful under the ELCRA.  The evidence shows that plaintiff had a poor attendance record, and she was warned about her habit of taking undocumented "sick" days.  There is evidence that other custodians were fired for attendance problems.   In addition, the district was forced during plaintiff's extended workers' compensation leave to reassign  plaintiff's duties to persons on different shifts, leading to the discovery that there was no need for a third shift custodian. Given this evidence and plaintiff's attendance history, it is simply not possible to conclude that the defendants' proffered reasons for her schedule change and termination are a pretext for retaliation in violation of the ELCRA. The defendants are therefore entitled to summary judgment in their favor on plaintiff's retaliation claims as a matter of law.

## 3.

## GENDER DISCRIMINATION – DIFFERENTIAL TREATMENT

Finally, in their motion the defendants also argue that there is no evidence to support

70

plaintiff's claim that she was subjected to gender discrimination in the form of disparate treatment.   A plaintiff asserting a claim of disparate treatment must establish the following required elements:  (1) she was a member of a protected class, (2) she suffered "an adverse employment action," (3) she was "qualified for the position," but (4) "she was discharged under circumstances that give rise to an inference of unlawful discrimination."  Lytle v. Malady, 579 NW2d 906, 914 (Mich. 1998).  A plaintiff may also satisfy this final element by providing evidence that others similarly situated to plaintiff but outside the protected class were unaffected by the employer's adverse conduct.  Town v. Michigan Bell Telephone Co., 568 N.W.2d 64, 68 (Mich. 1997).  "Gender must be proved to be a determining factor in the allegedly discriminatory decision."  Id.  Although a plaintiff may create an inference of discrimination through the introduction of evidence showing that the employer's proffered reason for its decision is false, a plaintiff will not always present a triable issue of fact merely by rebutting the employer's stated reasons; there may be evidence of pretext, but if the factfinder must be persuaded that the defendant's actions were based on a discriminatory consideration.  Id. at 72-73.

        "To avoid summary disposition under the disparate treatment theory, the plaintiff must present sufficient evidence to permit a reasonable juror to find that for the same or similar conduct the plaintiff was treated differently from a similarly situated male employee." Duranceau v. Alpena Power Co., 646 N.W.2d 872, 874 (Mich. Ct. App. 2002).  "Plaintiff bears the burden of showing that the other employees were similarly situated.  The employer does not, in the first instance, need to offer proof of dissimilarity."  Lytle, 579 N.W.2d at 917 n.28. Superficial similarities between the plaintiff and her co-workers are not sufficient to show a

71

prima facie case of gender discrimination; rather, the plaintiff and the person or persons with whom she seeks to compare herself must be similar in all of the "relevant" aspects. E.g., Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). In a discriminatory discipline or firing context, "similarly-situated" means that "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). Although the comparison need not involve identical misconduct, the misconduct must be of comparable seriousness. Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir. 1999).

In her pleading, plaintiff's sole allegation of gender discrimination consists of the following: "By terminating [plaintiff] for violations of an absence procedure specific to her and for calling in late, the defendant [sic] treated [her] differently from similarly situated men." First Amended Complaint at 7, ¶ 51. Therefore, plaintiff's gender discrimination claim is based on the decision to fire her for violations of its policies relating to absences and the timely reporting of those absences.

In her response to the defendants' motion, plaintiff has not pointed to evidence showing that a similarly situated male employee was treated differently than she was. The court has searched plaintiff's brief in vain for an example of a male custodian who engaged in similarly-sanctionable conduct but received a lesser sanction than plaintiff – but plaintiff names no one. Plaintiff has pointed to no examples of male custodians who had an attendance history *similar to*

*hers* but who received a lesser sanction than termination.[32]   To the contrary, evidence cited by

both  plaintiff and the defendants indicate that Vera was demanding with all of his employees.[33]

In addition, to the extent that plaintiff's complaint alleges that she was treated differently

from unspecified males in terms of "violations of an absence procedure specific to her," the

defendants have demonstrated that no genuine issue of fact exists indicating that the procedure

for documenting absences was somehow unique to plaintiff.  Specifically, the defendants have

pointed to evidence that the collective bargaining agreement applicable to the River Valley

custodians – including plaintiff – provided that an employee whose absences exceeded three

---

[32]In the portion of her brief dedicated to her WDCA claim, plaintiff makes a statement indicating that Vera was "harsher on [her] than any other custodian for other reasons as well." Brief in Opposition at 31.  This is a vague statement, and plaintiff's record citations accompanying this statement do not contain admissible evidence supporting more than a superficial similarity between plaintiff and any male custodians.  "Superficial similarities between a disciplined employee and [her] colleagues are not sufficient to show a *prima facie* case of discrimination."  Arendale v. City of Memphis, No. 07-5320, 2008 WL 731226, *15 (6th Cir. March 20, 2008).

During her deposition, plaintiff testified that a "Mr. Harper" – who no longer works for the district – was frequently late.  Plaintiff's Dep. at 45.  However, being late for work is not the same as not coming to work at all, and in any event plaintiff does not provide evidence regarding the reason why Harper's employment ended.  The defendants have presented evidence that Harper was terminated after being subjected to progressive discipline for reasons related to his attendance, calling in late, and altering a time card.  Burnett Dep. (Exhibit P) at 49-50.

Plaintiff also mentions hearing a rumor that a custodian named Robert Zebel "faked" an illness.  Plaintiff's Dep. at 45-47.  However, plaintiff's evidence in this regard is inadmissible hearsay.  Finally, plaintiff mentions a former custodian named Bryan, who – she says – was not required to bring in doctor's slips to document his absences.  Plaintiff's Dep. at 55.  However, Bryan apparently suffered from lupus, a chronic medical condition, which apparently forced him to eventually leave his employment.  Plaintiff is not similarly situated to this person.

[33]Plaintiff cites at one point to the deposition of Don Koeller, another custodian, who testified that Vera was rude, and tended to be demanding and even sometimes unreasonable with all of the employees.  Koeller Dep. at 37.  Koeller testified that Vera did not believe that people should miss work, and "[e]ven if they had an excuse, there wasn't a good enough excuse for him."  Id. at 38.  The defendants have also cited to Koeller's testimony describing Vera as "bossy, very, very bossy."  Koeller Dep. (Exhibit U) at 27.

consecutive working days or five days in a calender year must provide a doctor's certificate certifying both the nature of the illness or injury necessitating the absence and that the employee is able to return to work.  Burns Dep. (Exhibit O) at 29-33; Vera Affidavit at 2, ¶ 5.  Plaintiff's absences easily exceeded the contractually specified number during each year of her employment.  Plaintiff knew about this contractual provision, but simply disagreed with it.  Plaintiff's Dep. at 40-42.  The defendants have pointed to evidence indicating that another custodian (presumably male) employed at one of the district's elementary schools had been required to provide medical certification that he was able to return to work without restrictions.  Burnett Dep. (Exhibit P) at 29.  (This requirement was intended to prevent job-related injuries.  Id. at 25.)[34]

Finally, to the extent that plaintiff's complaint alleges that she was treated differently from unspecified males for calling in late, the defendants do concede that one of the reasons for plaintiff's termination was her failure to provide at least two hours' notice of an absence on December 6, 2004, just days before her termination.  However, the defendants have presented evidence that a provision of the union contract required custodians to give the district two-hour notice of any absences.  Vera Affidavit at 4, ¶ 12; Koeller Dep. (Exhibit U) at 12.  The school superintendent also testified that it was difficult to find substitutes, and plaintiff had a problem with calling in on time.  Burns Dep. at 24-25.  Sometimes plaintiff would claim to have called, but the school had no record of it.  Id. at 31.

In summary, the defendants have established that no genuine issue of fact remains

---

[34]Another former custodian, Don Koeller, also testified that he provided a doctor's slip documenting any absence because he knew Vera would expect one.  Koeller Dep. (Exhibit U) at 43.

indicating that plaintiff was subjected to gender discrimination as she has alleged in her pleadings.  Because plaintiff has failed to show a prima facie case of discrimination based on differential treatment, the additional steps of the burden-shifting analysis are not necessary. Nevertheless, it should be noted that the defendants have provided ample documentation of plaintiff's poor attendance history, which provided them with a legitimate reason to terminate her employment.

**<u>Conclusion</u>**

The court grants the defendants' motion for summary judgment in its entirety.

So ordered this 22nd day of April, 2008.


 <u>/s/ Wendell A. Miles</u>
Wendell A. Miles, Senior Judge